Timothy **MARTIN,** Plaintiff,

v.

**CITY OF EASTLAKE, William DePledge, etc., Thomas Doyle, etc., Robert Jaksa, etc., Defendants.**

No. C86–3969.

United States District Court, N.D. Ohio, E.D.

May 18, 1988.

Gary D. Zeid, Sternberg & Zeid Co., L.P.A., Mentor, Ohio, for plaintiff.

Theodore R. Klammer, Law Director, City of Eastlake, Mentor, Ohio, for defendants.

## MEMORANDUM OF OPINION

KRENZLER, District Judge.

The plaintiff, Timothy Martin ("Martin"), commenced the instant action pursuant to 42 U.S.C. § 1983 ("§ 1983") against defendants, City of Eastlake ("City"), William DePledge, Chief of Police for the City ("DePledge"), Thomas Doyle, police officer for the City ("Doyle"), and Robert Jaksa, police officer for the City ("Jaksa"). Martin alleges deprivation of his constitutional rights under color of state law. The amended complaint, in essence, alleges that defendants Doyle and Jaksa, acting as police officers under color of state law, violated plaintiff's constitutional right to be free from illegal search and seizure. The amended complaint further alleged that the City maintained a policy and practice of illegal search and seizures. Finally, the amended complaint alleges a pendent state claim for assault and battery. Defendants responded with general denials as well as affirmative defenses, including that of qualified immunity.

This matter came on for a hearing on the issue of qualified immunity. At the hearing, the parties engaged in oral argument and presented evidence.

### I. *Facts*

A review of the pleadings, depositions, exhibits, and hearing testimony, reveals the following facts. On May 2, 1986, Tammy Poldiak ("Tammy"), a mentally retarded 15–year–old girl, reported to her teacher that she had been raped the previous night. After her teacher contacted the Lake County Department of Human Services and the Eastlake Police Department, Tammy was taken to the Lake County Memorial Hospital. At the Hospital, Tammy was examined by a doctor utilizing the Dew's Expert Rape Kit. The examination revealed that some sexual activity may have occurred, although it was unclear whether such activ-

ity was self-inflicted or through intercourse.

Detective Leon Hodkey ("Detective Hodkey"), a police officer for the City, arrived at the Hospital between 3:30 and 4:00 p.m. Detective Hodkey's initial information regarding the case was conveyed by Rene Friedrich of the Lake County Human Services Department. Detective Hodkey was informed that Tammy was mentally retarded and had the mentality of a third grader. Detective Hodkey interviewed Tammy, Tammy's mother, and a friend of Tammy's.

According to Tammy, the alleged rape took place at the home of a neighbor. At approximately 8:00 or 9:00 p.m. the previous night, Tammy had gone over to the neighbor's home to play with one of the children who lived in the house. Subsequently, Tammy's friend was taken shopping, leaving Tammy in the yard. Tammy then told Detective Hodkey that she had been invited into the house by a male. It was at this time that the alleged rape occurred. Tammy told Detective Hodkey that she had been taken into the basement of the house, shown nude pictures, and then had been sexually assaulted. Tammy identified her assailant as a man having big muscles and curly yellow hair. Tammy also described the interior of the residence and described the television shows that she had watched at the house the previous night.

Certain inconsistencies developed in Tammy's statement. She originally stated that her assailant was wearing a black mask, that he was not wearing underwear, and that he injected Tammy with drugs. However, Tammy later stated that her assailant was wearing a red mask and that he was wearing underwear. In addition, the medical examination found no evidence that Tammy had been injected with drugs. These inconsistencies, with the exception of the information regarding the drugs, were conveyed to other officers on the case.

While Detective Hodkey was still at the Hospital gathering information, he was in contact with Detectives Jaksa and Doyle by telephone. Hodkey informed Jaksa and Doyle of the basic alleged facts of the case.

After conferring with Detective Hodkey, Detectives Jaksa and Doyle went to plaintiff's residence where they interviewed Cathy Dennis ("Dennis"), the owner of the house where the alleged rape took place. Dennis lived in the house with three children and a boarder, the plaintiff. Dennis identified the plaintiff as matching the physical description given by Tammy. Dennis told the Detectives that Tammy had been at the house the previous evening. Dennis had left Tammy alone in the yard when Dennis had left the house with her children to go to the store. When Dennis returned later in the evening, plaintiff and Tammy were watching television. Dennis also told the Detectives that Tammy had been in the house on one or two prior occasions. There was a common room in the house which contained nude pictures but that, to Dennis' knowledge, Tammy had never been in that portion of the house. Dennis also informed the Detectives that plaintiff was presently at his place of employment.

Detectives Jaksa and Doyle next proceeded to the plaintiff's place of employment. The detectives identified themselves as police officers and informed plaintiff's employer that they were conducting an investigation and needed assistance from the plaintiff. Plaintiff was summoned by his employer and met the officers outside. The officers informed plaintiff of Tammy's allegations against him. At approximately 4:30 p.m., the officers placed plaintiff in custody and, after stopping for coffee, took him to the police station. At no time was a warrant for plaintiff's arrest obtained by any officer of the Eastlake Police Department. At the station, the plaintiff was "booked," informed of his constitutional rights, and questioned. Plaintiff offered his full cooperation and consented to a search of his residence and the taking of blood and pubic hair samples. Plaintiff was held at the station for approximately three hours and was released at approximately 7:00 p.m.

Detective Jaksa searched plaintiff's residence and seized several items of clothing belonging to the plaintiff.

In his statement to the police, plaintiff acknowledged that Tammy had come to the house the previous evening looking for her friend. When informed that her friend was ·not there but would be returning shortly, Tammy asked if she could wait inside and watch television. The plaintiff allowed Tammy to wait inside. He stressed that no sexual activity occurred.

After plaintiff's arrest and the completion of the investigation, it was concluded .that no charges would be filed against plaintiff. The physical evidence gathered by the detectives, the inconsistent statements made by Tammy, and the results of the medical examination did not support Tammy's allegations of rape. A report from the Lake County Forensic Lab, received on May 15, 1986, confirmed the lack of evidence that a rape had occurred. Consequently, no charges were ever filed against the plaintiff. Plaintiff then commenced the instant action.

## II. *The Law of Qualified Immunity*

■ 42 U.S.C. § 1983 provides for the redress of constitutional violations committed by state actors while acting under the color of state law. There are no affirmative defenses explicitly included in § 1983. However, the Supreme Court of the United States has determined that, in 1871 when Congress enacted § 1983, it was the congressional intent that certain common law immunities from liability apply in cases brought under § 1983. *See generally Scheuer v. Rhodes*, 416 U.S. 232, 241–49, 94 S.Ct. 1683, 1689–93, 40 L.Ed.2d 90 (1974). One such immunity is absolute immunity, most commonly asserted by judges and prosecutors, in which a defendant, despite committing a constitutional violation, is held immune from liability if the act was committed within the scope of defendant's official duties. *See, e.g., Stump v. Sparkman*, 435 U.S. 349, 356–57, 98 S.Ct. 1099, 1105, 55 L.Ed.2d 331 (1978) (A judge has absolute immunity in his actions, even if done maliciously, unless the actions were taken in total absence of all jurisdiction.).

■ The most commonly asserted immunity under § 1983 is qualified immunity. This immunity is almost always asserted by law enforcement officials in cases which allege that they have violated a plaintiff's constitutional rights.[1] Unlike absolute immunity, qualified immunity does not provide total protection to a defendant in a § 1983 case. Although courts talk in general terms about whether a defendant is entitled to qualified immunity, they often do not attempt to define qualified immunity, or to state its basic purpose. Qualified immunity, in its simplest terms, is given to an officer who may have violated a constitutional right of a person, if the officer's actions are such that a reasonable officer could have believed that the actions were lawful, in light of clearly established law and the information the officer possessed. In effect, qualified immunity may shield from liability, an officer who violates another's constitutional rights.

The extent to which qualified immunity protects a defendant from liability, the standard for applying the qualified immunity defense, and the procedural and case management issues arising out of the qualified immunity defense, have undergone several major changes recently. These changes have occurred because of both the increasing number of § 1983 cases filed against public officials, particularly law enforcement officers, and because of the increasing burden the large number of § 1983 cases places on the courts.

Prior to 1982, the standard or test for the qualified immunity defense included both an objective and a subjective element. The objective element "involved a presumptive knowledge of and respect for 'basic unquestioned constitutional rights.' The subjective component refer[red] to 'permissible

---

1. This Court shall use the term "law enforcement officials or officers" in its discussion of the qualified immunity defense. However, the defense is available to a myriad of defendants who have allegedly violated a plaintiff's constitutional rights. *See, e.g., Spencer v. Staras*, 507 F.2d 554 (7th Cir.1974) (state hospital employees entitled to assert qualified immunity defense); *Gonzalez v. Leonard*, 497 F.Supp. 1058 (D.C.Conn.1980) (immigration official entitled to assert qualified immunity defense).

intentions.'" *Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 2737, 73 L.Ed. 2d 396 (1982) (citations omitted). A defendant was entitled to qualified immunity unless, *"he knew or reasonably should have known* that the actions he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], or if he took the action with the malicious intention to cause a deprivation of constitutional rights ..." *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975) (emphasis added). *See also Butz v. Economou,* 438 U.S. 478, 506, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978) ("... [i]t is not unfair to hold liable the official who knows or should know that he is acting outside the law....").

The courts, however, began to realize that a subjective standard for qualified immunity was not conducive to an early termination of cases in which law enforcement officials were entitled to the qualified immunity defense. This inability to terminate cases prior to extensive discovery or trial came from the necessity of a court having to decide the defendant's motives and intent. Determination of such motive and intent often created a material issue of fact. Therefore, because there was a material issue of fact, a court could not decide the qualified immunity issue on a pretrial motion. *See infra.* The courts found that defendants in § 1983 cases were, therefore, being burdened by being forced to expend excessive amounts of time conducting discovery and preparing for trial. *See Harlow v. Fitzgerald,* 457 U.S. at 817, 102 S.Ct. at 2737–38 ("Judicial inquiry into subjective motivation ... may entail broad-ranging discovery and the deposing of numerous persons, including an official's professional colleagues. Inquiries of this kind can be peculiarly disruptive of effective government.").

In 1982, in the case of *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed. 2d 396 (1982), the Supreme Court changed the standard for the qualified immunity defense in order to eliminate the need to determine the defendant's state of mind or motive. *Id.* at 815–16, 102 S.Ct. at 2737. Basically, the Supreme Court simply deleted the subjective element of the prior subjective/objective test. The standard enunciated in *Harlow* gave qualified immunity to those officials whose "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. The Court, in *Harlow,* stated that, "[r]eliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Id.*

An analysis of the qualified immunity standard established in *Harlow* demonstrates that not only did the Supreme Court change the standard for qualified immunity but also that arguably the Supreme Court, in effect, eliminated much of the protection the immunity gave to defendants. Under the *Harlow* standard, upon a court determining that the constitutional right which the defendant allegedly violated was clearly established, the defendant was not entitled to qualified immunity. Put simply, if a defendant did not violate a clearly established constitutional right, the defendant was entitled to qualified immunity. If a defendant did violate a clearly established constitutional right, he was not entitled to qualified immunity. Accordingly, under the *Harlow* standard, there was really no need for qualified immunity because under this standard a defendant was entitled to qualified immunity only if he could have shown that he did not violate a clearly established constitutional right.[2]

---

2. The foregoing argument has merit unless the added language "that a reasonable person knows or should have known" has some significant meaning. To give this phrase significant meaning, however, would place a burden on the defendant to demonstrate which law a reason-

able person would not know. This burden of proof would be extremely difficult to prove and would place a high degree of uncertainty into whether a defendant would be granted qualified immunity.

The Supreme Court, in 1987, although not stating that it was changing the standard for qualified immunity, altered the standard in *Anderson v. Creighton*, — U.S. ——, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). *See* 107 S.Ct. 3034, 3043–49 (Stevens, J. dissenting). In *Creighton*, the Supreme Court held that a law enforcement officer claiming the defense of qualified immunity is entitled to such immunity if "a reasonable officer could have believed [the defendant's actions] to be lawful, in light of clearly established law and the information the ... officer possessed." *Id.* at 3040. Once again, as in *Harlow*, the defendant's subjective beliefs were held to be irrelevant. *Id.*[3]

In comparing the *Harlow* standard with the *Creighton* standard, the changes made by the Supreme Court are apparent. An official is entitled to qualified immunity if:

"[his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738.

"a reasonable officer could have believed [his conduct] to be lawful, in light of clearly established law and the information the ... officer possessed." *Creighton*, 107 S.Ct. at 3040.

As was previously stated, in the *Harlow* standard, the Supreme Court equated the qualified immunity defense with a violation of a clearly established constitutional right and thereby basically negated the qualified immunity defense. Under the *Creighton* standard, an officer may be able to successfully assert the qualified immunity defense even though he violated a clearly established constitutional right. The focus of the qualified immunity defense in *Creighton* is not on whether the constitutional right was established or not, but is on whether a *reasonable police officer would have believed* that the actions violated clearly established constitutional rights.

Courts and defendants are often reluctant to admit that a law enforcement official can violate a constitutional right and not be held liable for the violation. Therefore, most of the time such statements are not made. However, the courts have recognized that police officers do make mistakes. *See Malley v. Briggs*, 475 U.S. 335, 343, 106 S.Ct. 1092, 1097, 89 L.Ed.2d 271 (1986) (defense of qualified immunity gives officer "ample room for mistakes."). The courts have made the policy judgment, through the qualified immunity defense, that if a mistake made by a law enforcement official is reasonable and not gross or aggravated, the official will not be held liable, despite the official having violated the plaintiff's constitutional rights.

The Supreme Court has stated that district courts are to terminate § 1983 cases where the defendants are entitled to qualified immunity as early in the litigation process as possible. *See Creighton*, 107 S.Ct. at 3038 (The "substantial social costs, including the risk of personal monetary liability and harrassing litigation will unduly inhibit officials in the discharge of their duties...."); *see also Harlow*, 457 U.S. at 817, 102 S.Ct. at 2737–38 ("[B]road-ranging discovery and the deposing of numerous persons ... can be peculiarly disruptive of effective government."). In conjunction with the recent changes in the standard for applying qualified immunity, *see supra*, courts have turned their attention to the procedural aspects of the raising and the deciding of the issue of qualified immunity. The courts, in their concern for following the mandate for resolving the issue of qualified immunity at an early stage of the litigation have altered some of the regular procedural practices followed in cases not containing a qualified immunity defense issue.

 A case can be disposed of at least four times by a court during the course of litigation. A case may be disposed of by a court on a motion to dismiss. Fed.R.Civ.P.

---

**3.** The Supreme Court, in *Creighton*, further clarified the term "clearly established law" as it is used in the standard for qualified immunity. Basically, "clearly established law" refers to the law as it related to the specific facts in each case. Each case is to be decided on its own particular facts. *Creighton*, 107 S.Ct. at 3039.

12(b), on a motion for summary judgment, Fed.R.Civ.P. 56, on a motion for a directed verdict, Fed.R.Civ.P. 50(a), and on a motion for judgment notwithstanding the verdict, Fed.R.Civ.P. 50(b).

### A. *Motion to Dismiss*

It is well established that qualified immunity is an affirmative defense, *Harlow,* 457 U.S. at 815, 102 S.Ct. at 2736–37, and that failure to raise the defense of qualified immunity constitutes a waiver of that defense. *Kennedy v. City of Cleveland,* 797 F.2d 297, 299 (6th Cir.1986). The general rule is that a defendant has the burden of proving an affirmative defense. Yet, in an effort to terminate cases in which the defendant is clearly entitled to a qualified immunity defense, several courts have stated that this general rule is not applicable.

■ In *Dominique v. Telb,* 831 F.2d 673 (6th Cir.1987), the Sixth Circuit Court of Appeals stated that it was error to place the entire burden of proving the qualified immunity defense onto the defendant. The Court stated that it is incumbent upon a plaintiff to plead

> such ... facts or allegations that show not only violations of his constitutional rights, but also that these rights were so clearly established when the acts were committed that any officer in the defendant's position, measured objectively, would have clearly understood that he was [violating the plaintiff's constitutional rights].

*Id.* at 676 (citing *Creighton,* 107 S.Ct. at 3039). Therefore, if a plaintiff fails to allege sufficient allegations to withstand the qualified immunity defense, a court may grant a motion to dismiss the complaint.

### B. *Motion for Summary Judgment*

■ If a plaintiff has pled sufficient allegations to withstand a motion to dismiss, the defendant may next assert the qualified immunity defense by filing a motion for summary judgment, pursuant to Fed.R.Civ.P. 56. The Supreme Court in its desire to see "qualified immunity questions ... resolved at the earliest possible stage of a litigation," *Creighton,* 107 S.Ct. at

3042, n. 6, has limited the general rule that a motion for summary judgment should be ruled upon only after the opposing party has completed discovery.

The Supreme Court, although desiring not to place the burden of extensive discovery upon a defendant claiming the qualified immunity defense, does recognize that allowing a plaintiff to conduct *limited discovery* may be necessary prior to deciding the issue of qualified immunity.

> [I]t should first be determined whether the actions the [plaintiff] allege[s the defendant] to have taken are actions that a reasonable officer could have believed lawful. If they are, then [the defendant] is entitled to dismissal prior to discovery. If they are not, and if the actions [the defendant] claims he took are different from those the [plaintiff] allege[s] [and are actions that a reasonable officer could have believed lawful], *then discovery may be necessary* before [the defendant's] motion for summary judgment on qualified immunity grounds can be resolved. *Of course, any such discovery should be tailored specifically to the question of [the defendant's] qualified immunity.*

*Id.* (emphasis added) (citations omitted). Therefore, when a defendant files a motion for summary judgment prior to the completion, or even the beginning of the discovery period, a court must limit a plaintiff's discovery to the narrow issue of the qualified immunity defense.

Although the plaintiff may be permitted to conduct limited discovery, a court may still decide the qualified immunity issue on a motion for summary judgment early in the course of litigation. Yet, it must be remembered that under Fed.R.Civ.P. 56, a court may grant summary judgment only upon a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The ability to grant summary judgment only upon undisputed facts, does limit the number of cases which will be able to be disposed of at this stage of the litigation. This is particularly true in light of the fact that a court must look to

the "fact-specific" question of whether a "reasonable officer could have believed [the defendant's actions] to be lawful, in light of clearly established law and the information the searching officer's possessed." *Creighton,* 107 S.Ct. at 3040. *See supra,* note 3. Thus, despite the admonition toward the courts to resolve the qualified immunity issue at an early stage of the litigation, if a material issue of fact is present in the case, the case must proceed to trial.

A court, in following the mandate of the Supreme Court, must change its traditional role in case management, particularly in the earlier stages of litigation. Generally, a court relies on the parties to plead as they wish and to file or not file dispositive motions on their own initiative. However, this role does not comport with the goal of the early resolution of the qualified immunity defense issue.

The Fifth Circuit Court of Appeals, in *Elliott v. Perez,* 751 F.2d 1472 (5th Cir. 1985), placed an affirmative duty on the district courts to take the initiative and force the parties to present the court with the information needed to decide the qualified immunity question.

> Probably of greatest importance is that the burden of being able to ascertain what the real facts are in order to determine the defense of immunity is placed squarely on the district judge. The trial judge may not wait on motions or other

actions by the parties or counsel. Fortunately, trial judges have the tools to carry out this mission.

*Id.* at 1480.

■ This Court, in an attempt to resolve the qualified immunity issue in § 1983 cases, has not waited for defendants who plead the qualified immunity defense to file dispositive motions, but has, *sua sponte,* called the cases for qualified immunity hearings. At these hearings, this Court has taken evidence and listened to the arguments of counsel as if the parties were presenting a motion for summary judgment.[4]

For example, in another case presently pending before this Court, *Lowery v. City of Cleveland,* Case No. C87–2347, one of the plaintiffs alleges that he was the victim of excessive force by law enforcement officials. The officials then raised the defense of qualified immunity. This Court, *sua sponte,* set the matter for a qualified immunity hearing. At the hearing, conflicting testimony was presented regarding the events alleged in the complaint. In this situation, the Court could not determine whether the defendant is entitled to qualified immunity at this stage of the proceedings. Rather, the case must proceed to trial where the trier of fact will determine the facts of the case and will be instructed to draw the appropriate legal conclusions.

Despite the directives of the Supreme Court and the court of appeals, this Court

---

4. This Court, in the qualified immunity hearings, has applied the standard for granting a motion for summary judgment, pursuant to Fed.R.Civ.P. 56(c), and rendered judgment for the defendant only if the evidence shows that "there is no genuine issue as to any material fact and that [the defendant] is entitled to [qualified immunity] as a matter of law." Fed.R.Civ. P. 56(c). In ruling on the issue of whether the defendant is entitled to qualified immunity, this Court "construe[s] the evidence in its most favorable light in favor of the [plaintiff] and against the [defendant]." *Bohn Aluminum & Brass Corp.,* 303 F.2d 425, 427 (6th Cir.1962). It has been argued before this Court that the proper standard which should be applied is the standard for the granting of a directed verdict, Fed. R.Civ.P. 50(a), or whether a reasonable jury could find for the nonmoving party, viewing the evidence with all reasonable inferences in favor of the nonmoving party. *See Sove v. Smith,* 355

F.2d 264, 268 (6th Cir.1966). In support of the argument, the cases of *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corporation v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), have been cited. This Court does not find the argument persuasive. First, there has been no explicit statement by the Supreme Court that the standard for granting summary judgment has been changed to that of the standard for granting a directed verdict. Second, although the Supreme Court does state that the standards for granting a motion for summary judgment and a motion for a directed verdict are "mirrors" of each other, this Court does not deem this statement to mean that the standards are identical and therefore interchangeable. Accordingly, this Court shall continue to apply the standard for summary judgment as stated in Fed.R.Civ.P. 56(c).

has concluded that the theory and the reality of making an early decision on whether a defendant is entitled to qualified immunity are entirely different. This Court has concluded that the attorneys for the plaintiffs have seen the necessity of creating a material issue of fact in order to stop courts from possibly granting a defendant qualified immunity and thereby shield the defendant from liability. The material issue of fact can be created through the submission of an affidavit or by sworn testimony at a qualified immunity hearing. The present case, which does not contain a material issue of fact is a rarity. Therefore, the well-intentioned goal of the early termination of frivolous cases against law enforcement officials is generally ineffective because of the realities of the practice of law. Accordingly, this Court will no longer hold qualified immunity hearings, but will require the parties to submit, in writing, their evidence and arguments relating to qualified immunity. This will permit this Court to review the documents and determine whether a question of fact exists early in the proceedings, without the necessity of a time- and resource-consuming qualified immunity hearing.

■ The denial by a court of the qualified immunity defense to a defendant on a motion to dismiss or on a motion for summary judgment does not necessarily automatically move the case into the next phase of litigation, however. The general rule is that the denial of a motion to dismiss or a motion for summary judgment is not appealable. However, in *Kennedy v. City of Cleveland*, 797 F.2d 297 (6th Cir.1986), the Court stated that a denial of the defense of qualified immunity on either a motion to dismiss or a motion for summary judgment is appealable to the court of appeals. During this appeal, the action in the district court is stayed. *Id.* at 299. "Therefore, it is possible that the progress of civil rights actions ... may be interrupted by not one but two interlocutory appeals." *Id.* The Sixth Circuit Court of Appeals, in *Kennedy*, recognized the possible case management problem involved with permitting appeals of the denial of the qualified immunity defense; however, it found the compel-

ling interest to resolve the qualified immunity issue prior to discovery and trial of greater concern.

> We recognize the opportunity for abusive delay inherent in the protections afforded by the [doctrine] of ... qualified immunity, but we believe that it can be minimized by diligent administration of trial proceedings in the district court and the effective use of procedures for expediting the resolution of insubstantial appeals in the court of appeals.

*Id.* at 301.

### C. Trial Motions

■ In the event a § 1983 case containing a qualified immunity defense proceeds to trial, there are two more times the court may grant qualified immunity. The first occurs following the presentation of the plaintiff's case or at the end of both the plaintiff's and the defendant's case. Generally, at both of these times, the defendant will move for a directed verdict pursuant to Fed.R.Civ.P. 50(a). *See supra*, Note 4. At this stage, a defendant may move for a directed verdict on either or both grounds that the plaintiff has failed to prove a constitutional violation or that the plaintiff has failed to prove sufficient facts to deny the defendant the qualified immunity defense.

If the plaintiff succeeds in withstanding a motion for a directed verdict, the Court submits the issue of liability to the jury. In charging a jury on the qualified immunity defense, this Court sees no compelling reason to deviate from the normal instructions used in charging a jury on an affirmative defense. The Court should instruct the jury to first decide the issue of whether the defendant violated a plaintiff's constitutional right. The jury should then be instructed that if it finds a constitutional violation it should then determine whether the defendant is entitled to the defense of qualified immunity. This Court reaches this conclusion because although the Supreme Court and the courts of appeals have placed the qualified immunity doctrine in a special category for pretrial procedures, the reason for the special categoriza-

tion, the prevention of defendants from being burdened by extensive discovery and preparation for trial, is no longer valid.

The fourth and final time a court may grant the defendant qualified immunity is on a motion for judgment notwithstanding the verdict, pursuant to Fed.R.Civ.P. 56(b).

In summation, it is clear that the recent changes involving both the standard for applying qualified immunity and the procedural and case management issues arising out of an assertion by a defendant of qualified immunity, were made to accomplish the goal of permitting the resolution of the qualified immunity question as soon as possible in the course of litigation. It is with this goal in mind that the courts and the parties should proceed in a case where the qualified immunity defense has been raised.

### III. *Application*

#### A. *Detectives Doyle and Jaksa*

■ Detectives Doyle and Jaksa raise the affirmative defense of qualified immunity. They defend on the grounds that they are protected from civil liability on the grounds of qualified immunity. As previously stated, whether a police officer is protected by qualified immunity for an alleged unlawful, official action generally turns on the "objective legal reasonableness" of the action, *Harlow*, 457 U.S. 800, 819, 102 S.Ct. 2727, 2739, assessed in light of the legal rules that were "clearly established" at the time it was taken. "The relevant question is the objective (albeit fact-specific) question whether a reasonable officer could have believed ... [his actions] to be lawful in light of clearly established law and the information the ... officers possessed." *Creighton*, 107 S.Ct. 3034. The Court shall focus upon whether the police officers are entitled to qualified immunity and need not examine the merits of the § 1983 claim. If the Court finds the police officers are entitled to qualified immunity, the § 1983 action is over as to the claims against the officers granted qualified immunity.

The Court held a hearing on the issue of qualified immunity at which Detectives Jaksa and Doyle both testified. After a review of the oral testimony, depositions, exhibits, and answers to interrogatories, the Court concludes that Detectives Jaksa and Doyle are entitled to qualified immunity.

■ Under clearly established law, an arrest is lawful if it is based upon probable cause. Probable cause must exist that a crime has been committed and that the one arrested committed the crime. *United States v. Pollack*, 739 F.2d 187 (5th Cir. 1984). In the instant action, reasonable police officers could have believed that they arrested plaintiff with probable cause. First, the officers had probable cause to believe that a crime had been committed. The officers possessed statements by Tammy, the victim, and Tammy's mother, that the rape had occurred. The medical evidence also confirmed that sexual activity may have occurred. Second, the detectives had probable cause to believe the plaintiff had committed the crime. The alleged rape took place at plaintiff's residence and plaintiff matched the physical description given by the victim. Tammy also accurately described the interior of the house in question. Dennis' statements to the officers also linked plaintiff to the alleged rape, in that she had returned home on the previous night to find plaintiff and Tammy alone together and that Tammy had never been to the portion of the house containing nude pictures. At the hearing, the detectives testified that their decision to arrest was also influenced by the violence of the offense and the possibility of destruction of evidence. Based upon a review of the entire record, the Court concludes that Detectives Jaksa and Doyle, acting as reasonable officers, could have believed that their actions in arresting plaintiff were lawful in light of clearly established law and the information possessed by the Detectives at the time of the arrest. Upon consideration of all of the facts and circumstances of the case, the Court concludes that Detectives Jaksa and Doyle are entitled to the defense of qualified immunity. Accordingly, this Court shall enter judgment in favor of defendants Jaksa and Doyle.

### B. *City of Eastlake*

The plaintiff seeks to recover from the City on the basis that the City maintained a policy and practice of allowing police officers to violate the constitutional rights of its citizens. Section 1983 is available to redress constitutional violations that result directly from a municipal policy or custom. *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, the plaintiff, in open court, acknowledged that he would be unable to prove such a policy or custom. Accordingly, there is no basis of liability on which to hold the City liable. Accordingly, the City shall be dismissed from the present action.

### C. *William DePledge*

Two possible theories of liability exist with regard to DePledge, Chief of Police for the City. One such theory is that DePledge acted as a policymaker and promoted a policy in the City whereby police officers would violate the constitutional rights of its citizens. As previously mentioned, the plaintiff, in open court, indicated that no such policy existed. Thus, the policymaker theory is not an available basis on which to attach liability to DePledge. The second theory on which to hold DePledge liable is that DePledge was an actor and acted under color of state law to violate the plaintiff's constitutional rights. However, the plaintiff has failed to allege any facts indicating that DePledge directly participated in the events in question. Therefore, the actor theory is not an available basis on which to attach liability to DePledge.

Accordingly, DePledge shall be dismissed from the present action.

### IV. *Conclusion*

Defendants Jaksa and Doyle are entitled to qualified immunity and cannot be held liable in this action. Accordingly, judgment shall be entered in favor of defendants Jaksa and Doyle. The Court shall dismiss, with prejudice, defendants City and DePledge on the basis that the plaintiff has failed to state a claim upon which relief can be granted against either of these defendants. Because no federal claims remain, this Court declines to exercise its pendent jurisdiction over the pending state law claim and shall dismiss it, without prejudice. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).