**Raymond J. PESEK, Plaintiff,**

v.

**CITY OF BRUNSWICK, et al., Defendant.**

**No. 91–CV–991.**

United States District Court,
N.D. Ohio, E.D.

July 2, 1992.

Avery S. Friedman, Gloria Rowland Homolak, Friedman & Associates, Cleveland, Ohio, for plaintiff.

Timothy T. Reid, Reid, Berry & Stanard, Cleveland, Ohio, for defendant City of Brunswick.

Charles F. Clarke, III, Martin Harris, Squire, Sanders & Dempsey, Timothy T. Reid, Reid, Berry & Stanard, Cleveland, Ohio, for defendant Robert Trimble.

Mark J. Valponi, Kelley, McCann & Livingstone, Timothy T. Reid, Reid, Berry & Stanard, Cleveland, Ohio, for defendant Gregory Crane.

Timothy T. Reid, Reid, Berry & Stanard, Cleveland, Ohio, Gene McKenna, Armbruster, Kelley, McKenna & Modugno, Akron, Ohio, for defendant Tex Combs.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SAM H. BELL, District Judge.

Trial of this cause was held by this court without the intervention of a jury on April 21 and April 22, 1992. It was instituted with the filing of a complaint by plaintiff Raymond J. Pesek on May 22, 1991 against defendants the City of Brunswick (hereinafter Brunswick), Robert Trimble, Gregory Crane, and Tex Combs. The complaint seeks recovery pursuant to 42 U.S.C. § 1983 and alleges primarily that defendants violated Pesek's right of free speech under the first amendment to the United

States Constitution in not allowing him to speak at a Brunswick City Council meeting. But Mr. Pesek alleges not only a violation of his first amendment rights; he also seeks a declaration that the portion of the Brunswick City Charter upon which the alleged restriction was based is both unconstitutional on its face and as applied. Plaintiff, finally, alleges that he was suspended from his public employment for attempting to exercise his first amendment rights and that the suspension resulted in a deprivation of his fourteenth amendment procedural due process, substantive due process, and privileges and immunities rights.

The court has heard all of the testimony and has before it all of the evidence presented in this case. Based upon this testimony and evidence, the following represents this court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

## I. FINDINGS OF FACT

1. Plaintiff Pesek is a citizen and part-time employee of Brunswick serving as a paramedic and firefighter.

2. Brunswick is a municipality chartered under the rules and regulations of the state of Ohio and is subject to the provisions of the United States Constitution.

3. Defendant Trimble is and was at all relevant times the Brunswick City Manager.

4. Defendant Crane is and was at all relevant times the Brunswick Director of Safety. As the director of safety, he is responsible for the supervision over the Chief of the Brunswick Fire Department.

5. Defendant Combs is and was at all relevant times the chief of the Brunswick Fire Department and as such is responsible for the supervision of employees of the fire department, including Pesek.

6. The Brunswick City Council held a meeting on April 15, 1991. In attendance at this meeting were Pesek and all three individual defendants (Pesek testimony). Brunswick councilperson Dale Strasser presided over this meeting (Strasser Testimony). This meeting was open to the public and 41 residents of Brunswick attended (Defendants' Exhibit G, minutes of April 15, 1991 meeting with attached sign-in sheet). There were several items on the agenda for this meeting and, at certain times, members of the public were allowed to express their views (*id.*).

7. Item number seven on the agenda was labeled "Staffing Fire Stations # 1 and # 2" (*id.*). Specifically, the Council discussed possible ways to staff the fire station 24 hours per day and to reduce fire and ambulance response time (*id.*).

8. Sometime during this discussion, Pesek raised his hand, desiring to speak to Council on the subject of improving Brunswick's ambulance and fire services, including response time (Pesek testimony). At this point Trimble, sitting next to Strasser, pointed toward Pesek and whispered to Strasser that Pesek was not allowed to speak directly to Council about "fire-related issues" pursuant to the Brunswick City Charter (Strasser testimony). Specifically, Trimble instructed Strasser that if Pesek desired to speak about a "fire-related issue," the Charter required that he go through a chain of command, starting with Trimble as city manager (Trimble testimony).

9. Pursuant to Trimble's instructions, Strasser did not initially recognize Pesek; Pesek, however, yelled "hold on" in a further attempt to be recognized (Pesek testimony). Trimble himself then directly addressed Pesek:

Skip—you want to speak on a fire issue?

Ray—Yes sir.

Skip—Council does not deal with employees. You deal through me if you're an employee.

Ray—I am a citizen and taxpayer.

Skip—You're also an employee.

Ray—Would you put that in writing?

Skip—I already told you, it's in the Charter. Council deals with employees through me—that's in the Charter.

(Defendants' Exhibit F, transcript from tape recording of conversation, *see also* Defendants' Exhibit G).[1]

10. On May 7, 1991 Pesek was issued a letter of suspension for his conduct during the April 15 city council meeting. Specifically, the letter, written by Combs, expresses as follows:

After several directives you did try to communicate with Council of the Whole on April 15, 1991, which was a public meeting.

Please be advised this is in direct violation of Brunswick Fire Department Rules and Regulations, Article 2, Section 5, Shall conform to and obey all rules, orders, resolutions and regulations, whether general, special or verbal. This is also in direct violation of Brunswick Charter, Article 3, Section 3.05 B Prohibitions, which states that all employees shall deal with Council solely through the City Manager.

You are hereby suspended from all duties without pay, beginning May 13, 1991 at 1800 hours. Be advised that you may appeal this decision to Greg Crane, Safety–Service Director, within ten (10) days of this notice. This request for an appeal must be in writing.

Plaintiff's Exhibit 24. The Brunswick City Charter section upon which Pesek's discipline was based, § 3.05(b), provides as follows:

Except for the purpose of inquiries and investigations under Article VI, Section 6, the Council or its members shall deal with City officers and employees who are subject to the direction and supervision of the City Manager solely through the City Manager, and neither the Council nor its members shall give orders to any such officer or employee either publicly or privately.

Plaintiff's Exhibit 1. Defendants thus contend that Pesek, as a fire department employee, is prohibited by the Charter from "trying to communicate" directly to the City Council about "fire-related" issues because § 3.05(b) allows council members to "deal with" employees only through the

city manager, Trimble (Trimble testimony; Crane testimony; Combs testimony). Pesek is the only Brunswick employee who has ever been punished in any way for speaking or attempting to speak at a City Council meeting (Crane, Trimble, Strasser, and Councilman Brad Burge testimony).

11. Pesek appealed his suspension and requested a hearing thereon in the form of a letter sent to Combs and Crane on May 9, 1991, pursuant to the Brunswick Division of Fire Rules and Regulations (Plaintiff's Exhibit 26; Plaintiff's Exhibit 2 at p. 6).

12. On July 1, 1991 Crane sent Pesek a letter which stated that a hearing regarding Pesek's appeal of the suspension had been scheduled (Plaintiff's Exhibit 34). Although rescheduling was requested by plaintiff, the hearing was never held. On September 17, 1991 Crane issued a decision upholding the suspension (Plaintiff's Exhibit 46). Crane did agree with Pesek that the notice of the suspension was untimely under the Brunswick Division of Fire Rules and Regulations and ordered that he be reimbursed for lost wages during the one-week suspension period (*id.*). The suspension was upheld in all other respects (*id.*).

13. There was no evidence presented that Pesek held a property interest under state law which entitled him to continued employment as a part-time Brunswick firefighter. Pesek offered no evidence of any ordinance, regulation, policy, or express or implied contract which would support any claim that he possessed an entitlement to continued employment under state law.

14. Pesek challenges his suspension directly in this case on substantive and procedural due process and privileges and immunities grounds under the fourteenth amendment. Plaintiff also charges that both the actions on April 15, 1991 in preventing him from speaking and the subsequent suspension therefor violated his first amendment free speech rights. On July 15, 1991 the parties reached a temporary resolution of these disputes by executing an Agreed Judgment on Motion for Preliminary Injunction in which Pesek agreed not to oral-

---

1. "Skip" is a nickname for Trimble.

ly address members of Council on employment related matters and Trimble agreed to submit Pesek's communications to the City Council after receiving them from Combs and Crane.

## II. CONCLUSIONS OF LAW

### A. Introduction

Pesek's § 1983 claim in this case is premised upon several claimed constitutional violations. He alleges that both the restriction imposed upon his speech on April 15, 1991 and the subsequent suspension violated his first amendment rights. He also claims that the suspension violated his fourteenth amendment substantive due process, procedural due process, and privileges and immunities rights. In defending this action, defendants raise several arguments, foremost of which is the contention that Pesek was deprived of none of the claimed constitutional rights in this case. In addition, Brunswick maintains that, even were the court to find that one or more of Pesek's constitutional rights had been violated, it cannot be held liable therefor pursuant to applicable legal standards governing municipal liability. Similarly, the individual defendants maintain that they are immune from liability under the doctrine of qualified immunity.

With this background in mind, the court will analyze the parties' respective arguments as follows: first, it will attempt to determine whether Pesek was deprived of any constitutional right. This requires, first, an analysis of plaintiff's fourteenth amendment claims and then an examination of his first amendment averments. After this, the court will address issues regarding municipal and individual liability, including the doctrine of qualified immunity. The court will then briefly comment upon Pesek's challenge to the constitutionality of the City Charter provision at issue, and conclude with a discussion concerning damages in this case.

### B. The Fourteenth Amendment

#### 1. Substantive Due Process

■ Pesek has premised this suit upon 42 U.S.C. § 1983, which provides as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

Section 1983 confers no substantive rights of its own, but is rather only a vehicle by which to seek redress for violations of specific constitutional or other federal rights. *Braley v. City of Pontiac,* 906 F.2d 220, 223 (6th Cir.1990).

Inasmuch as it is premised upon § 1983, Pesek's cause must in its entirety be considered as one seeking to invoke rights granted under the fourteenth amendment. See *Monroe v. Pape,* 365 U.S. 167, 171, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), *overruled on other grounds Monell v. Department of Social Services of New York City,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Pesek primarily seeks vindication of his rights under the due process clause of the fourteenth amendment, which has been described as follows:

The Due Process Clause of the Fourteenth Amendment, which imposes the same restraints on the state that the corresponding clause of the Fifth Amendment imposes on the national government, prohibits "any State [from] depriv[ing] any person of life, liberty, or property, without due process of law ..." No right to due process arises, under this language, except where a state undertakes to deprive a person of one or more of the three interests specified: life, liberty, or property.

*Inmates of the Orient Correctional Institute v. Ohio State Adult Parole Authority,* 929 F.2d 233, 235 (6th Cir.1991).

Moreover, Pesek's complaint can be viewed as raising both "substantive" and "procedural" due process concerns. With respect to the former, the law recognizes two separate types of fourteenth amendment substantive due process. The Sixth Circuit has differentiated between the two facets of substantive due process in the following manner:

> The first category encompasses claims based on a "right, privilege, or immunity secured by the Constitution or federal laws other than the Due Process Clause of the Fourteenth Amendment *simpliciter.*" *Wilson,* 770 F.2d at 585 (quoting *Parratt v. Taylor,* 451 U.S. 527 at 536, 101 S.Ct. 1908 at 1913, 68 L.Ed.2d 420 (1981)) (emphasis in original). The second category of substantive due process claims identified in *Wilson* includes allegations of official acts which "may not take place no matter what procedural protections accompany them," *Wilson,* 770 F.2d at 586 (quoting *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 3208 n. 4, 82 L.Ed.2d 393 (1984) (separate opinion of Stevens, J.)), or which "shock the conscience of the court."

*Hayes v. Vessey,* 777 F.2d 1149, 1152 (6th Cir.1985), quoting *Wilson v. Beebe,* 770 F.2d 578 (6th Cir.1985). *See also G.M. Engineers and Associates, Inc. v. West Bloomfield Township,* 922 F.2d 328, 332 (6th Cir.1990); *Braley,* 906 F.2d at 224–25; *Parate v. Isibor,* 868 F.2d 821, 831 (6th Cir.1989).

In the case at bar, Pesek claims both that defendants have deprived him of a constitutional right other than the due process clause of the fourteenth amendment *simpliciter, i.e.,* his right of free speech under the first amendment,[2] and that the suspension he received itself violated his substantive due process rights under the fourteenth amendment. Although Pesek's first amendment claim must thus in reality be

considered a fourteenth amendment due process claim, the court has chosen to analyze it separately as a first amendment claim due to the fact that entirely different standards apply thereto. At this point, then, we concentrate only upon the claimed violation of the fourteenth amendment *simpliciter.*

The *Hayes* opinion previously noted suggests that this court should find for Pesek as to this aspect of his claim if the evidence reveals that the conduct of defendants in suspending Pesek "shocks the conscience." While the Sixth Circuit in subsequent years has seemingly retreated from this standard, *see Braley,* 906 F.2d at 226 and *Cassady v. Tackett,* 938 F.2d 693, 698 (6th Cir.1991), it has more recently reaffirmed and applied it, *see United of Omaha Life Insurance Company v. Royal Maccabees Life Insurance Company,* 960 F.2d 31, 35 (6th Cir.1992). However, regardless of the propriety of the "shocks the conscience" test, it is clear that Pesek possesses no fourteenth amendment substantive due process right in his state employment. The Sixth Circuit has recently followed the majority view among the courts in this regard by holding as it did in *Sutton v. Cleveland Board of Education,* 958 F.2d 1339, 1350–51 (6th Cir.1992). There the circuit court opined that the substantive due process clause of the fourteenth amendment only protects "fundamental" constitutional rights, not state-created rights to employment. *Id.* Because Pesek's part-time employment with the Brunswick Fire Department only rises to the level of a state-created right as opposed to a fundamental constitutional right, we conclude that it lacks fourteenth amendment substantive due process protection. For this reason, we find for defendants as to this portion of Pesek's claim.

2. Privileges and Immunities

 Pesek also alleges that his suspension and the lack of procedural protections

**2.** It is of course widely recognized that, although the Bill of Rights do not apply to the states and their subdivisions directly, they have been incorporated into the due process clause of the fourteenth amendment and are in this manner applicable to the states. *See Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 983, 108

L.Ed.2d 100 (1990) (due process clause of the fourteenth amendment "incorporates many of the specific protections defined in the Bill of Rights. A plaintiff may bring suit under § 1983 for state officials' violation of his rights to, *e.g.,* freedom of speech ...").

accompanying it violated his rights under the privileges and immunities clause of the fourteenth amendment. Complaint at ¶ 29. This claim need be only briefly discussed. The privileges and immunities clause provides that "[n]o state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." The very language of the clause itself precludes Pesek's claim. Neither in his complaint nor in his proffer of evidence at trial did Pesek assert any challenge to a state law or the enforcement thereof which has allegedly abridged his privileges and immunities. Rather, Pesek's claims amount to challenges only to certain conduct of government officials. As such, the claimed violation of his "privileges and immunities" rights does not contain merit, and so the court finds for defendants as to this claim. *See also Bettio v. Village of Northfield*, 775 F.Supp. 1545, 1570–71 (N.D.Ohio 1991).

### 3. Procedural Due Process

■■■■ Pesek's final claim under the fourteenth amendment is that defendants did not provide him with constitutionally adequate procedures prior or subsequent to his suspension from his employment in order to safeguard his fourteenth amendment procedural due process rights. The decision rendered in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) offers us guidance here. In *Loudermill*, the court held that, where a public employee holds a sufficient property interest in continued employment, the constitution requires a minimal hearing prior to the employee's termination from employment. *Id.*, 470 U.S. at 542, 105 S.Ct. at 1493. At a minimum, the pretermination hearing requires that the employee be given notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. *Id.*, 470

U.S. at 545, 105 S.Ct. at 1495. Further, one who is merely suspended from employment, rather than terminated, may still be entitled to constitutional protection, so long as the suspension is not a *"de minimus"* deprivation. *See Boals v. Gray*, 775 F.2d 686, 697 (6th Cir.1985) (suspension totalling five days is not a *de minimus* deprivation (Wellford, J., concurring), cited in *Gillard v. Norris*, 857 F.2d 1095, 1098 (6th Cir. 1988)).

The evidence in this case establishes that Pesek was not afforded a hearing either prior or subsequent to the May 7, 1991 suspension. Defendants contend, however, that Pesek's procedural due process claim is barred as a matter of law because he did not appeal it to the appropriate state court of common pleas pursuant to O.R.C. § 2506.01.[3] Defendants are arguing that to succeed with a procedural due process claim where he has chosen not to avail himself of available state corrective procedures, the § 1983 plaintiff must show that the state corrective procedures are inadequate to protect his rights. The principle of law relied upon by defendants has its genesis in *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), and has been described as follows:

> Thus we hold that in section 1983 damage suits claiming the deprivation of a property interest without procedural due process of law, the plaintiff must plead and prove that state remedies for redressing the wrong are inadequate. In a procedural due process case under section 1983, the plaintiff must attack the state's corrective procedure as well as the substantive wrong.

*Vicory v. Walton*, 721 F.2d 1062, 1065–66 (6th Cir.1983). *See also Sutton, supra*, 958 F.2d at 1349.

■■■■ However, this rule has a significant exception not discussed by the parties in their post-trial briefing. The *Parratt* rule only applies where the deprivation of prop-

---

**3.** This section provides as follows:

Every final order, adjudication, or decision of any officer, tribunal, authority, board, bureau, commission, department, or other division of any political subdivision of the state may be reviewed by the court of common pleas of the county in which the principal office of the political subdivision is located as provided in Chapter 2505. of the Revised Code, except as modified by this chapter.

· · · · ·

erty is caused by random and unauthorized conduct; where it results from "established state procedure," the plaintiff need not exhaust his state remedies or show that those remedies are inadequate. *See Macene v. MJW, Inc.,* 951 F.2d 700, 705–06 (6th Cir. 1991). In *Zinermon,* n. 2, *supra,* the court indicated that where the deprivation of property was predictable, where predeprivation process could have been afforded, and where the conduct in question was authorized in some manner by the state, the deprivation can be said to result from "established state procedure." *Id.,* 494 U.S. at 136–38, 110 S.Ct. at 989–90.

Neither Pesek nor any of defendants have addressed the issue of whether the failure to afford Pesek a hearing amounted to "random and unauthorized" as opposed to "established state procedure." The court might suggest that, in light of the evidence submitted and pursuant to the teachings of *Zinermon,* the conduct at issue here could possibly be labeled in the latter fashion. However, the parties' silence on this issue is troubling and, rather than engage in conjecture, we choose to examine another aspect of Pesek's procedural due process claim.

■ As the holding of *Loudermill* makes clear, the § 1983 plaintiff must hold a *sufficient property interest under state law in continued employment* before he can invoke the protections of procedural due process. *Matulin v. Village of Lodi,* 862 F.2d 609, 615 (6th Cir.1988).[4] The claimed property right may be shown by evidence of a statute, policy, practice, regulation, guideline, written contract, or contract implied from the "mutually explicit understanding" of the parties. *Duncan v. City of Oneida,* 735 F.2d 998, 100 (6th Cir.1984). *See also Woolsey v. Hunt,* 932

---

**4.** It should be noted that, while the existence of a state-created property right is insufficient to invoke substantive due process concerns, such a right does implicate procedural due process.

**5.** Pesek also alleges that the City Council did not allow him to speak at a meeting on May 20, 1991. Complaint at § 32. There is virtually no evidence in the record concerning this alleged event other than the minutes of the meeting, which reflect that Pesek was ruled out of order for asking a question concerning the staffing of

F.2d 555, 563–64 (6th Cir.1991), *cert. denied* —— U.S. ——, 112 S.Ct. 195, 116 L.Ed.2d 155 (1991).

In the case at bar, Pesek has produced no evidence that he possesses a right under state law to continued employment as a part-time firefighter. A review of the applicable statutory scheme, further, does not reveal that such a right exists under Ohio law. *See* O.R.C. § 737.01 *et seq.* Further, no policy, practice, regulation, guideline, or written contract was produced by Pesek at trial to support the claim that he possessed a right to continued employment. Finally, no testimony was elicited concerning the possibility that Pesek and Brunswick or the Fire Department may have been privy to some "mutually explicit understanding" which conferred some type of property interest in continued employment upon Pesek.

Thus the court finds that there is a failure of proof as to this element of Pesek's procedural due process claim. Pesek simply has no sufficient property right to continued employment which would entitle him to seek the protection of the fourteenth amendment's due process clause. For this reason, the court grants judgment in favor of defendants as to this aspect of Pesek's claim.

### C. The First Amendment Claims

#### 1. The City Council Meeting of April 15, 1991

Pesek's primary complaint in this case is that defendants violated his first amendment right to free speech when they did not allow him to speak to the Brunswick City Council at the Council meeting held on April 15, 1991.[5] Defendants argue that

---

the Brunswick fire stations. *See* Plaintiff's Exhibit 29. Without any additional evidence regarding the nature of the speech or the extent to which it was prohibited, however, it is impossible for the court to determine the efficacy of any claim regarding this event. Pesek's trial strategy, apparently, was to concentrate solely on the events of April 15, 1991 and his suspension. There being a failure of proof on Pesek's part as to the events of May 20, 1991, the court will limit its analysis of the first amendment

this claim is barred as a matter of law by the Supreme Court decision *Minnesota State Board For Community Colleges v. Knight,* 465 U.S. 271, 104 S.Ct. 1058, 79 L.Ed.2d 299 (1984). There is reason to discuss the *Knight* opinion and at least one other in order to give logic to this court's view on the issue now presented.

In *Knight,* several state community college faculty instructors brought suit challenging certain portions of the Minnesota Public Employment Labor Relations Act (PELRA). PELRA, specifically, divides public employees into bargaining units and establishes a procedure for the designation of an exclusive bargaining agent for each unit. PELRA also requires that public employers negotiate with the exclusive representatives over the terms and conditions of employment. Finally, the statute grants professional employees such as college faculty the right to "meet and confer" with their employers on employment matters which fall outside the scope of mandatory bargaining, but only allows the employer to "meet and confer" over such matters with the employees' exclusive bargaining representative, even though some employees may not be members of the exclusive representative and may disagree with its views.

At issue before the Supreme Court in *Knight* was the latter provision of PELRA. Specifically, the Court was faced with the question of "whether the restriction on participation in the nonmandatory-subject exchange process violates the constitutional rights of professional employees within the bargaining unit who are not members of the exclusive representative and who may disagree with its views." *Id.,* 465 U.S. at 273, 104 S.Ct. at 1060. In other words, the Court was faced with deciding whether such a restriction unconstitutionally denied the plaintiff employees the opportunity to participate in their government employer's policymaking in violation of the first amendment.

In holding that the free speech and association rights of the faculty instructors were not infringed by PELRA, the Court

claim to the April 15 City Council meeting and

initially noted that the case before it involved neither a claim of access to a public forum nor to a nonpublic forum. The Court therefore distinguished two cases as inapposite to its reasoning: *City of Madison, Joint School District No. 8 v. Wisconsin Employment Relations Commission,* 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976), and *Perry Education Association v. Perry Local Educators' Association,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). In *City of Madison,* a municipal board of education and a union were engaged in negotiations over the renewal of a collective bargaining agreement. While the negotiations were ongoing, the board of education held a public meeting at which it allowed a nonunion school teacher to comment upon a particular union proposal in the negotiations. The union in question filed a complaint with the Wisconsin Employment Relations Commission (the Commission), alleging that the board, by allowing the nonunion teacher to speak at the meeting, had engaged in negotiations with a member of a bargaining unit other than the exclusive representative in violation of Wisconsin law. The Commission agreed, ordering the board to cease and desist from permitting nonunion employees from speaking at board meetings on matters subject to collective bargaining between the board and the Union. The Commission's order was upheld throughout the state appellate process.

The Supreme Court reversed, holding that the Commission's order constituted an unconstitutional prior restraint on the first amendment rights of the teachers. *Id.,* 429 U.S. at 177, 97 S.Ct. at 427. In support of its holding, the Court reasoned, *inter alia,* that the school board meeting at issue had been open to the public "[as] a forum for direct citizen involvement," *id.,* 429 U.S. at 175, 97 S.Ct. at 426. As such, the Commission was prohibited from *selectively* allowing certain portions of the public to participate while at the same time preventing others from participating. *Id.* The Court in *Knight* revisited this reasoning and held it to be irrelevant in the case before it:

Pesek's suspension.

The First Amendment was violated when the meetings were suddenly closed to one segment of the public even though they otherwise remained open for participation by the public at large. These cases, by contrast, involve no selective closure of a generally open forum, and hence any reliance on the City of Madison case would be misplaced.

*Knight,* 465 U.S. at 281, 104 S.Ct. at 1064 (footnote omitted). Inasmuch as the "meet and confer" sessions at issue in *Knight* could not be considered public fora, the faculty members' claim could not be considered one for access to such fora and hence the holding in *City of Madison* offered them no support.

The Court in *Knight* went on to conclude that "the claim in these cases is not even a claim of access to a *nonpublic* forum, such as the school mail system at issue in *Perry Education Assn.*" *Id.,* 465 U.S. at 281, 104 S.Ct. at 1064. In *Perry Education Assn.,* a collective bargaining agreement between a union and the local board of education provided that the union would have exclusive access to the interschool mail system and teacher mailboxes in the district's schools. A rival union brought suit under § 1983, contending that this preferential access to the interschool mail system violated the first amendment and the equal protection clause of the fourteenth amendment. The Supreme Court disagreed, noting that the type of forum implicated, the interschool mail system, was nonpublic as opposed to public in nature. *Id.,* 460 U.S. at 46–47, 103 S.Ct. at 955–56. For this reason, the Court denied the rival union's first amendment claim of access to the forum: "when government property is not dedicated to open communication the government may—without further justification—restrict use to those who participate in the forum's official business." *Id.,* 460 U.S. at 53, 103 S.Ct. at 959.

As it did with *City of Madison,* the Court in *Knight* differentiated the constitutional challenge in *Perry Education Assn.* from that before it. In the latter case, "[a] private organization there claimed the right of access to government property for use in speaking to potentially willing listeners among a group of private individuals and public officials not acting in an official capacity." *Id.,* 465 U.S. at 282, 104 S.Ct. at 1064. By contrast, the plaintiff employees in *Knight* did not seek access to a nonpublic forum in order to exercise their rights to communicate with private citizens, but rather claimed the right to communicate their ideas to the government directly:

Appellees here make a claim quite different from those made in the nonpublic-forum cases. They do not contend that certain government property has been closed to them for use in communicating with private individuals or public officials not acting as such who might be willing to listen to them. Rather, they claim an entitlement to a government audience for their views.

*Id.* Thus, the reasoning set forth in *Perry Education Assn.* is inapplicable. *Id.,* 465 U.S. at 282–83, 104 S.Ct. at 1064–65.

With the foregoing distinctions drawn, the Supreme Court in *Knight* held that the plaintiff faculty members possessed

no constitutional right to force the government to listen to their views. They have no such right as members of the public, as government employees, or as instructors in an institution of higher education.

*Id.,* 465 U.S. at 283, 104 S.Ct. at 1065. In the case at bar, defendants invoke this holding in support of their defense to Pesek's first amendment claim. According to defendants, Pesek, in attempting to speak directly to the Brunswick City Council on April 15, 1991, was doing nothing more than attempting to force the government to listen to his views as to the policymaking issues before the Council that evening. As such, defendants maintain, Pesek's claim is expressly barred by the holding in *Knight.* In essence, defendants are contending that, regardless of what label we place upon the forum involved, *Knight* counsels that citizens such as Pesek have no constitutional right to force the government to listen to their views as members of the public or as government employees. As one can discern, defendants' position underplays seriously the importance of several distinc-

tions—those involving the public forum/nonpublic forum dichotomy and those involving Pesek's status in the community.

Pesek attempts to distinguish the holding in *Knight* from the facts herein by focusing upon these distinctions. According to Pesek, both *Knight* and *Perry* involved *non*public fora while this case, like *City of Madison*, involves a *public* forum. Thus, maintains Pesek, this court should follow the latter case and hold that the City Council was acting in violation of his rights when it selectively denied him the opportunity to express his views as a citizen on the night in question while at the same time granting others the same opportunity. In order to determine the efficacy of this argument, it is necessary to examine the specific nature of the forum at issue, the Brunswick City Council meeting of April 15, 1991. Discussing *Perry Education Assn.*, the Supreme Court has recently drawn the following distinctions between types of fora for purposes of first amendment scrutiny:

> In *Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 74 L.Ed.2d 794, 103 S.Ct. 948 (1983), the Court announced a tripartite framework for determining how First Amendment interests are to be analyzed with respect to Government property. Regulation of speech activity on governmental property that has been traditionally open to the public for expressive activity, such as public streets and parks, is examined under strict scrutiny. *Id.*, at 45, 74 L.Ed.2d 794, 103 S.Ct. 948 [at 954]. Regulation of speech of property that the Government has expressly dedicated to speech activity is also examined under strict scrutiny. *Ibid.* But regulation of speech activity where the Government has not dedicated its property to First Amendment activity is examined only for reasonableness. *Id.*, at 46, 74 L.Ed.2d 794, 103 S.Ct. 948 [at 954].

*United States v. Kokinda*, 497 U.S. 720, ——, 110 S.Ct. 3115, 3119, 111 L.Ed.2d 571, 581 (1990). With respect to the second type of forum, the Court has declared that the government may create a "limited public forum" out of an otherwise nonpublic forum "by intentionally opening a nontraditional forum for public discourse." *Cornelius v. NAACP Legal Defense and Education Fund, Inc.*, 473 U.S. 788, 802, 105 S.Ct. 3439, 3449, 87 L.Ed.2d 567 (1985).

■ We conclude that the city council meeting at issue falls under the second category discussed in *Perry Education Assn.* and *Kokinda*. It is undisputed that Brunswick held the meeting open to the public and allowed citizens generally to speak to council regarding items on the agenda that night. In Pesek's suspension letter, in fact, Combs characterized the meeting as a "public meeting" (Plaintiff's Exhibit 24). Thus, while the meeting might not properly be labeled a "traditional" public forum such as a public street or sidewalk, it is unquestioned in this case that Brunswick intentionally held it open for public discourse and, in so doing, created a limited public forum.

■ With this in mind, it remains to determine whether our characterization of the meeting has any bearing on the merits of Pesek's first amendment claim. In the mind of the court, this question is pivotal. In *Perry Education Assn.* and *Knight*, the fora involved were nonpublic in nature; in *Knight*, hence, the plaintiffs had no right in such a forum to express their views directly to government policymakers. In *City of Madison*, however, the plaintiffs did possess such a right because the government had opened its doors to discussion by members of the public in general, just as in the case before us. When the people through its government create a public forum for discussion of issues and the dissemination of public opinions, that government may not limit the forum to discussion by some and not to all of those who wish to speak. Specifically, here, the government may not prohibit government employees from speaking when the prohibition is based solely on the speaker's status as an employee. *Id.*, 429 U.S. at 175–176, 97 S.Ct. at 426–427. Put another way, such a prohibition fails strict scrutiny examination under the first amendment.

Moreover, the court does not read *Knight* as overruling or conflicting in any way with *City of Madison,* as defendants suggest. In this regard, the public/nonpublic forum dichotomy is all-important. In a nonpublic forum, such as was involved in *Knight,* citizens possess no first amendment right to express their views directly to government policymakers. It bears repeating, however, that *where the government has intentionally created a public forum out of an otherwise nonpublic forum by allowing certain members of the public to address it as to certain matters, it is a violation of the first amendment to selectively prohibit others from similarly addressing it as to the same matters based upon the content of their speech or their status in the community (e.g.,* as government employees).[6] As long as the government intentionally creates the public forum and "retain[s] the open character of the facility, ... it is bound by the same standards as apply in a traditional public forum." *Perry Education Assn.,* 460 U.S. at 46, 103 S.Ct. at 955.

Although the Sixth Circuit is apparently silent on these issues,[7] there exists case authority which supports the proposition that, while no citizen possesses the general constitutional right to express his views directly to the government (*Knight*), the government nonetheless may not selectively prohibit a citizen from speaking at a public meeting based upon the content of the speech or upon the speaker's status (*City of Madison*). In particular, a line of cases has developed out of the Fourth Circuit which expressly supports this conclu-sion. Especially enlightening is *Local 2106, International Association of Firefighters, AFL–CIO v. City of Rock Hill,* 660 F.2d 97 (4th Cir.1981), a case almost factually indistinguishable from that before us. In *Rock Hill,* the plaintiffs were individual members of a local union who were employed as firefighters by the defendant city, Rock Hill. Rock Hill had in existence at the relevant time a policy statement applicable to the city's fire department which recognized a particular nonunion entity, the Rock Hill Firefighters Association, as spokesman and representative of the plaintiff employees. The policy statement also set forth general policies regarding wages and working conditions of the firefighter employees. In addition, South Carolina had in existence a statute nearly identical to § 3.05(b) of the Brunswick City Charter:

> Except for the purpose of inquiries and investigations, neither the council nor its members shall deal with municipal officers and employees who are subject to the direction and supervision of the manager except through the manager, and neither the council nor its members shall give orders to any such officer or employee, either publicly or privately.

*City of Rock Hill,* 660 F.2d at 98, quoting S.C.Code § 5–13–40(c).

The local union's president appeared at a Rock Hill city council meeting on behalf of the plaintiff employees and requested to speak to council on issues pertaining to the policy statement in effect, *viz.,* the wages

---

**6.** The Fourth Circuit has cogently recognized that the type of claim raised by *Pesek* involves both fourteenth amendment equal protection and first amendment concerns:

> When governmental action deprives a person or organization of the right to communicate its views, but at the same time allows other persons or organizations to speak, the Supreme Court sometimes analyzes the case under the First Amendment, as in *Bellotti, supra,* and sometimes under the Equal Protection Clause of the Fourteenth Amendment. *See, e.g., Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). Governmental action permitting some to speak, but denying the opportunity to others, raises an "equal protection claim ... [that] is closely

intertwined with First Amendment interests." *Mosley, supra,* 408 U.S. at 95, 92 S.Ct. at 2289. *Henrico Professional Firefighters Association, Local 1568 v. Board of Supervisors of Henrico County,* 649 F.2d 237, 241 (4th Cir.1981), citing *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). *See also Burson v. Freeman,* — U.S. —, — n. 3, 112 S.Ct. 1846, 1850 n. 3, 119 L.Ed.2d 5 (U.S.S.C.1992). In the case at bar, Pesek couches his claim in terms of first amendment analysis, rather than alleging an equal protection claim.

**7.** This court's research reveals that neither *Knight* nor *City of Madison* have ever been cited or discussed in a Sixth Circuit opinion.

and working conditions of the plaintiff employees. The city council refused to permit him to speak directly to it about such issues, relying on the state statute quoted above. However, at the same time, it opened the meeting to public participation with respect to these issues:

> The Rock Hill city council regularly permits residents and other interested persons to appear and speak before it during its regularly scheduled meetings with respect to all matters involving the public affairs of the city, but prohibits city employees from discussing matters concerning their employment.

*Id.*, 660 F.2d at 99. The plaintiff employees and their union filed suit alleging, *inter alia,* that Rock Hill had unconstitutionally applied the statute when the city council refused to allow them to express their views relating to employment matters at its public meeting. The district court disagreed and denied relief.

In reversing the ruling of the district court, the Fourth Circuit held that Rock Hill could not constitutionally prevent the plaintiffs from speaking to the city council about employment-related matters at meetings during which members of the general public were permitted to express their views about such matters:

> The district court found justification in Rock Hill's actions reasoning that council meetings are not a forum designed for citizens to address the public, but for citizens to address their complaints to government. This is not a valid distinction. It is conceded that council meetings were open to any citizen of Rock Hill to comment on any subject relating to city government except for the prohibition affecting city employees. Rock Hill thus provided a public forum, *Madison v. Wisconsin Employment Relations Commission,* 429 U.S. 167, 175, 97 S.Ct. 421, 426, 50 L.Ed.2d 376 (1976), and in singling out, to exclude from that forum, municipal employees wishing to discuss municipal employment matters, it violates the first and fourteenth amendments. *Madison, supra; Hickory Firefighters Association, Local 2653 v. City of Hickory,* 656 F.2d 917 (4th Cir.1981);

*Henrico Professional Firefighters Association, Local 1568 v. Henrico County,* 649 F.2d 237 (4th Cir.1981).

It is true the Firefighters have no constitutional right to require the council to bargain with them. *Smith v. Arkansas State Highway Employees, Local 1315,* 441 U.S. 463, 99 S.Ct. 1826, 60 L.Ed.2d 360 (1979) (per curiam). It is not necessary, however, to decide whether the council meetings had to be open for discussion of collective bargaining as opposed to actual negotiation since the Firefighters had made it clear that they did not even intend to discuss collective bargaining but only the council policy relating to working conditions. The Supreme Court was explicit in *Madison* and *Police Department of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972), that government employees have a protected right to discuss conditions of their employment in a government forum open to the public. This court recently in *Henrico, supra,* and *Hickory, supra,* made it clear that this right enunciated in *Madison* extends to firemen. Here it is conceded that the council meetings are open and, in fact, a member of the general public was allowed to address the council on the subject of Rock Hill's employment policy toward firefighters. The admitted policy concerning employees is a content-based limitation on free speech and is an impermissible classification under the equal protection clause of the fourteenth amendment.

*Id.*, 660 F.2d at 100.

The cases cited by the court in *City of Rock Hill* are also illuminating. *See, e.g., Hickory Firefighters Assn.,* 656 F.2d at 922 (municipality cannot "open a meeting to the public and then prohibit the Association's speech simply because of what the Association is or what its representatives wish to say"); *Henrico Professional Firefighters,* 649 F.2d at 246 (court rejects view "that because a government may sometimes close its doors entirely to the public or limit discussion to certain subjects only, it may deny access to an association when

it welcomes any individual to speak, and allows representatives of groups other than the public employees to be freely heard").[8] In addition, the Fourth Circuit has on at least two occasions since *Knight* reiterated these holdings. *See Fraternal Order of Police v. Mayor and City Council of Ocean City, Maryland*, 916 F.2d 919, 922 (4th Cir.1990) ("... a government body that regularly allows public comment by individuals and representatives of associations may not deny a representative of a public employee association the opportunity to be heard on employment matters absent compelling justification"); *Shopco Distribution Company, Inc. v. The Commanding General of Marine Corps Base, Camp LeJeune, North Carolina*, 885 F.2d 167, 171 (4th Cir.1989) (government need not create a public forum by opening it for direct citizen involvement, "[b]ut once opened, speech in these forums is subject to the same protections as speech in traditional public forums"). Other courts are generally in agreement with this reasoning. *See, e.g., White v. City of Norwalk*, 900 F.2d 1421, 1425 (9th Cir.1990) (city council meetings become public fora once they are opened to the citizens who thereby "have an enormous first amendment interest in directing speech about public issues to those who govern their city"); *Jones v. Heyman*, 888 F.2d 1328, 1331 (11th Cir. 1989) (although city commission need not have opened its meeting to the public, "once it did so the commission became bound by the same standards that apply in the case of a traditional public forum"); *National Anti–Drug Coalition, Inc. v. Bolger*, 737 F.2d 717, 721 (7th Cir.1984) ("... a state is not required to indefinitely retain the open character of a facility for expressive activity, but 'as long as it does so it is bound by the same standards as apply in a traditional public forum,'" quoting *Perry* ).

█ Pursuant to *City of Madison* and its progeny, we conclude that Brunswick created a limited public forum by inviting citizen participation at its city council meeting on the evening of April 15, 1992. As such, the Council was prohibited from selectively denying Pesek his right to address the Council regarding a matter which was part of the agenda that night based solely upon his status as a government employee. To do so amounts to a content-based restriction and does not pass constitutional muster because it does not offer a compelling justification for the action taken, a justification which must be shown in order to meet the standard of strict judicial scrutiny. *See Perry Education Assn.*, 460 U.S. at 45, 103 S.Ct. at 955 ("For the state to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end"). Thus, inasmuch as Pesek sought to express his views on an agenda item at an open City Council meeting, the court finds that he was deprived of his first amendment right of free speech when the Brunswick City Council selectively denied him the right to express these views on April 15, 1991.

The court now turns to the second aspect of Pesek's first amendment claim, that involving his suspension from employment of May 7, 1991 based upon his status as a government employee and the content of his speech as related to a "fire issue."

## 2. The Subsequent Suspension

Although it is not altogether clear, Pesek's first amendment claim actually is comprised of two separate components. Pesek claims not only that he was deprived of his free speech rights when he was prevented from speaking on April 15, 1991, but also that Chief Combs impermissibly suspended him on May 7, 1991 in retaliation for his attempted exercise of his free speech rights. Pesek alleges in this regard as follows: "In order to punish and further

---

**8.** It is also important to note that in *Henrico Professional Firefighters,* the court rejected the defendant municipality's attempt to distinguish *City of Madison* on the basis that the latter case involved the denial of an *individual's,* as op- posed to an *association's,* free speech rights. *Id.,* 649 F.2d at 242. The same first amendment principles apply regardless of the speaker's status.

restrain plaintiff in and for the exercise of expression before the city council, ... defendant TEX COMBS ... suspended plaintiff for seven (7) days without pay for his April 15, 1991 attempt to speak to Council." Complaint at ¶ 12.

 To be sure, the government may not take adverse employment action against an individual in retaliation for the latter's exercise of his or her first amendment right of free speech. *Rankin v. McPherson,* 483 U.S. 378, 383, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987); *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). Moreover, such an adverse employment decision is impermissible even if it involves punishment short of dismissal. *Rutan v. Republican Party of Illinois,* 497 U.S. 62, ——, 110 S.Ct. 2729, 2737, 111 L.Ed.2d 52, 67 (1990). In order to determine whether an adverse employment decision runs afoul of the first amendment in this manner, it is necessary to strike "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). *See also Connick v. Myers,* 461 U.S. 138, 140, 103 S.Ct. 1684, 1686, 75 L.Ed.2d 708 (1983).

 The Sixth Circuit has recently set forth a two-part test for determining the efficacy of first amendment employment retaliation claims of this type based upon the balancing approach first enunciated in *Pickering.* In order to make out a *prima facie* claim, a plaintiff alleging retaliatory penalization against her employer based upon her exercise of first amendment rights must convince the trier of fact of three things:

1) the speech is related to a matter of public concern;

2) the plaintiff's interest in making the statement outweighs her employer's interest in promoting efficiency in its operations; and

3) the protected speech was a "substantial" or "motivating" factor in the decision to penalize the plaintiff.

*See Boger v. Wayne County,* 950 F.2d 316, 322 (6th Cir.1991). "If the plaintiff satisfies these requirements, she has established a *prima facie* case and the burden shifts to the employer to show by a preponderance of the evidence that there were other reasons for its adverse action and that it would have taken the same action even if the employee had not spoken." *Id.,* citing *Mount Healthy City Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Langford v. Lane,* 921 F.2d 677, 680 (6th Cir.1991).

 The first issue the court must determine is whether Pesek's speech on the evening of April 15, 1991 was related to a matter of public concern.[9] "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690. In the case at bar, of course, Pesek never made the statement, and so its content, form, and content apparently cannot be examined. However, we do not find this shortcoming to be an obstacle to further analysis, for Pesek's uncontradicted testimony fully reveals the subject of his aborted attempt to speak: ways to improve the Brunswick ambulance and fire services. Inasmuch as this subject was on the agenda at that time and other members of the public were invited to express their views thereon, we have no doubt from the record that Pesek intended to speak as a citizen on a matter of great interest to the communi-

9. As one can ascertain, the court's previous inquiry concerning the first aspect of Pesek's first amendment claim did not turn upon the issue of whether the speech related to a matter of public concern. Pursuant to *City of Madison,* the government may not prohibit its employees from speaking about *any* matter, public or private, at an open government meeting where members of the general public are permitted to speak about such matters. With respect to Pesek's retaliation claim, however, the nature of the asserted speech, as opposed to the nature of the forum, is obviously all-important.

ty. As such, although he was also a fire department employee, he should have been permitted to speak without fear of retaliation. *See Connick*, 461 U.S. at 149, 103 S.Ct. at 1691 (where speech addresses a matter of interest to the community, "it is essential that public employees be able to speak out freely without fear of retaliatory dismissal"). The fact that he did not actually speak, moreover, is no bar to this finding. In *Langford v. Lane*, 921 F.2d 677, *supra*, the court examined an employee's asserted right to *refrain* from speaking and held that her silence was based upon an *intention* to speak on a matter of public concern. *Id.*, 921 F.2d at 681. Similarly, inasmuch as Pesek intended to speak on a matter of public concern, his attempt at expressing himself is worthy of first amendment protection.

■ The second element of the *prima facie* case set forth in *Boger* asks whether Pesek's interest in making the statement outweighs the City's, or in this case the City Council's, interest in promoting efficiency in its operations. Among the factors which must be examined in engaging in this balancing test are the following:

> In order to justify a restriction on speech of public concern by a public employee, plaintiff's speech must impair discipline by superiors, have a detrimental impact on close working relationships, undermine a legitimate goal or mission of the employer, impede the performance of the speaker's duties, or impair harmony among co-workers.

*Meyers v. City of Cincinnati*, 934 F.2d 726, 731 (6th Cir.1991), citing *Rankin*, 483 U.S. at 388, 107 S.Ct. at 2899, and *Pickering*, 391 U.S. at 570–73, 88 S.Ct. at 1735–37. In assessing these factors as applied to the facts herein, we initially agree with defendants that there is some justification for the requirement that public employees discuss matters of employment with the City Council only through the city manager.[10] However, there is little if any justification for imposing the same requirement

upon public employees when they desire to speak upon matters of public concern solely as citizens at an open city council meeting. In this regard, it cannot be said that the interest implicated by § 3.05(b) of the City Charter, *viz.*, the promotion of efficiency respecting matters of government employment, outweighs Pesek's interest in speaking on a matter of public concern. This is but another way of holding that the interest underlying § 3.05(b) of the Charter simply is not served by prohibiting employees from speaking about matters of public concern at city council meetings merely because the asserted speech may be tangentially related to the speaker's working environment. While this court understands the rationale for the declination of city officials to conduct city business outside the "chain of command," then, the record does not demonstrate that Pesek's attempted speech would have impaired discipline by superiors, impacted upon close working relationships in detrimental fashion, undermined a legitimate goal of the City, impeded the performance of Pesek's duties, or impaired harmony among co-workers. For this reason, we conclude that the second element set forth in *Boger* favors Pesek in this case.

The final prong of the *prima facie* case needs little discussion. The suspension letter issued by Combs on May 7, 1991 unequivocally establishes that the protected speech was a substantial or motivating factor underlying the decision to penalize Pesek. Pesek was suspended, simply put, due to the content of his attempted speech. Thus, the final *prima facie* element also favors Pesek, who has therefore successfully made out his *prima facie* case.

The final inquiry concerning this aspect of Pesek's first amendment claim asks whether defendants have shown by a preponderance of the evidence that they would have taken the same action even if Pesek had not attempted to speak at the City Council meeting. Again, this issue can be

---

**10.** This opinion recognizes the requirement that city employees speak of matters relating to their employment only through their supervisors, *i.e.*, through some chain of command, as being inex-

tricably intertwined with the preclusion of public discussion spoken of here. This comment is specifically fact related to the circumstances which are the subject of our present discussion.

speedily resolved. The record unquestionably reveals that Pesek was suspended *solely* for his attempt to speak at the meeting; *see*, again, Combs' May 7, 1991 letter. Defendants have offered nothing by way of evidence indicating there were other reasons for the suspension, and so have failed in their burden of showing that the same action would have been taken regardless of Pesek's conduct at the City Council meeting. Thus, they have failed to overcome the *prima facie* case established by Pesek.

■ For the foregoing reasons, the court concludes that Pesek's suspension from employment was imposed in retaliation for his attempted exercise of his first amendment right of free speech. As such, the suspension amounts to a violation of this right and so the court also finds for Pesek on this aspect of his first amendment claim.

### D. *Municipal Liability*

■ Inasmuch as Pesek proffers two separate theories underlying his first amendment claim, it is axiomatic that he is attempting to hold Brunswick liable for two events: Trimble's denial of his right to speak at the City Council meeting on April 15, 1991 and his subsequent suspension from employment by Combs on May 7, 1991 made in retaliation for his attempted speech.[11] Defendant Brunswick argues that it cannot be held liable for these events pursuant to applicable standards governing municipal liability under 42 U.S.C. § 1983.

■ Before the court engages in an analysis of Brunswick's argument, it is necessary to briefly review these standards. A municipality cannot be held liable for the conduct of its officials in a § 1983 suit under a theory of *respondeat superior;* rather, such liability can only attach where the action underlying the plaintiff's claim was carried out pursuant to an official policy or custom of the municipality. *Monell v. Department of Social Servs.*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); *Johnson v. Hardin County*, 908 F.2d 1280, 1285 (6th Cir.1990). The decision in *Monell* recognizes that there are differences between municipal liability based upon a "custom" and that based upon a "policy" under § 1983. It is permissible to impose municipal liability under § 1983 not only where the challenged conduct represents formal official policy, but also where it reflects "practices of state officials so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613–14, 26 L.Ed.2d 142 (1970).

■ With regard to Pesek's suspension, Brunswick's argument is twofold. The city contends, first, that the undisputed evidence reveals that no Brunswick employee had ever been disciplined for speaking in or attempting to speak at a City Council meeting. Thus, according to Brunswick, the suspension cannot be said to represent a practice so permanent and well settled as to represent a "custom or usage" of the city. With this the court must agree. The uncontroverted testimony of Trimble, Crane, Strasser, and Burge establishes that Pesek is the only employee of Brunswick ever penalized for engaging or attempting to engage in such conduct. Thus, the single incident of adverse employment action involved in this case cannot be said to embody a custom or usage with the force of law within the meaning of *Monell*.

In order to hold Brunswick liable for his suspension based upon the first amendment encroachment, Pesek must therefore establish that the decision to suspend him amounted to an official "policy" within the meaning of *Monell*. The concept of finding a municipal policy based upon a single decision of a government official has its genesis in *Pembaur v. Cincinnati*, 475

---

11. Pesek has named the individual defendants in both their personal and official capacities. A § 1983 suit against a government official in his official capacity is considered an action against the municipality itself. *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S.Ct. 3099, 3104, 87 L.Ed.2d 114 (1985). Consequently, our analysis of municipal liability in this case also serves as an analysis of Pesek's claims as posited against Crane, Combs, and Trimble in their official capacities.

U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) and has been more recently expounded in *St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).

In *Pembaur,* the Court was faced with the issue of whether a single decision by a municipal official could be labeled a "policy" such that the municipality might be held responsible therefor under § 1983. The Court answered this question in the affirmative, holding that "it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Id.,* 475 U.S. at 480, 106 S.Ct. at 1298. Such "appropriate circumstances" exist where the decisionmaking official is vested with final decisionmaking authority to establish the policy in question. *Id.,* 475 U.S. at 481, 106 S.Ct. at 1299. In elucidating upon its holding, the Court was careful to emphasize the narrowness thereof:

> Having said this much, we hasten to emphasize that not every decision by municipal officers automatically subjects the municipality to § 1983 liability. Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. *See e.g., Oklahoma City v. Tuttle,* 471 U.S. [808] at 822–824, 85 L.Ed.2d 791, 105 S.Ct. 2427 [at 2435–37]. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable. Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law.... We hold that municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question. *See Tuttle, supra,* at 823, 85 L.Ed.2d 791, 105 S.Ct. 2427 [at 2436] (" 'policy' generally implies a course of action consciously chosen from among various alternatives.")

*Id.,* 475 U.S. at 481–84, 106 S.Ct. at 1299–1300 (footnotes omitted) (plurality). *See also Johnson,* 908 F.2d at 1286; *Hull v. Cuyahoga Valley Joint Vocational School District Board of Education,* 926 F.2d 505, 515–16 (6th Cir.1991), *cert. denied Hull v. Shuck,* —— U.S. ——, 111 S.Ct. 2917, 115 L.Ed.2d 1080 (1991).

In *Praprotnik,* another plurality opinion, the court further set forth the parameters of the holding in *Pembaur.* Specifically, there are four distinct requirements which must be met for such a claim to succeed:

> Two terms ago, in *Pembaur, supra,* we undertook to define more precisely when a decision on a single occasion may be enough to establish an unconstitutional municipal policy. Although the Court was unable to settle on a general formulation, Justice Brennan's opinion articulated several guiding principles. First, a majority of the Court agreed that municipalities may be held liable under § 1983 only for acts for which the municipality itself is actually responsible, "that is, acts which the municipality has officially sanctioned or ordered." 475 U.S., at 480, 89 L.Ed.2d 452, 106 S.Ct. 1292 [at 1298]. Second, only those municipal officials who have "final policymaking authority" may by their actions subject the government to § 1983 liability. *Id.,* at 483, 89 L.Ed.2d 452, 106 S.Ct. 1292 [at 1300] (plurality opinion). Third, whether a particular official has "final policymaking authority" is a question of *state law. Ibid.* (plurality opinion). Fourth, the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in *that area* of the city's business. *Id.,* at 482–483, and n. 12, 89 L.Ed.2d 452, 106 S.Ct. 1292 [at 1299–1300, and n. 12] (plurality opinion).

*Id.,* 485 U.S. at 123, 108 S.Ct. at 924.

Applying these standards to the instant case, we find that the decision to

suspend Pesek for his exercise of first amendment rights does not amount to an official policy of Brunswick. This is because state law does not vest final policy-making authority over the suspension of fire department employees in the individuals who were responsible for the suspension in this case, Combs and Crane. Pursuant to the dictates of Ohio law, neither Combs nor Crane is vested with final decisionmaking authority to make these types of decisions; as such, the decision to suspend Pesek cannot be attributed to Brunswick itself which therefore cannot be held liable under § 1983.

At first blush, this conclusion may actually appear contrary to Ohio law. The Ohio Revised Code establishes that the chief of police and the chief of the fire department for municipalities, respectively, possess the "exclusive right" to suspend employees under their control, see O.R.C. § 737.12. Thus, seemingly, Combs and Crane have final policy-making authority under state law to issue suspensions such as that involved here.

■ However, § 737.12 cannot be read in isolation. The Brunswick City Charter contains a conflicting provision which mandates that the city manager, in this case Trimble, has the power and is required to "appoint and remove all officers and employees" of Brunswick and to "institute proceedings, where necessary, for the removal of officers and employees within civil service." Id. at § 4.03(1), (2). This provision of the Charter must prevail over the conflicting section of the Code. That this is so is made manifestly clear by Ohio case law construing the "home rule" provisions of the Ohio Constitution, Article XVIII, §§ 3 and 7, which provide as follows:

> Municipalities shall have authority to exercise all powers of local self-government and to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws.

Id., Art. XVIII, § 3.

> Any municipality may frame and adopt or amend a charter for its government and may, subject to the provisions of section 3 of this article, exercise thereunder all powers of local self-government.

Id., Art. XVIII, § 7. Pursuant to these provisions, a municipality may, in the exercise of its powers of local self government, enact a provision in its city charter which is in conflict with a state law as long as the state law does not involve the concern of the state itself for the public health, safety, and welfare of its people. See Dies Electric Company v. City of Akron, 62 Ohio St.2d 322, 324–26, 16 O.O.3d 365, 405 N.E.2d 1026 (1980). If the charter provision in question embraces purely a matter of local self-government, in other words, it prevails over a conflicting state law. Id.

■ The rule enunciated in Dies, as applied to the facts of the cause herein, means that the Brunswick Charter provision which vests authority in the city manager to remove city employees controls over the conflicting state statute, O.R.C. § 737.12. This was precisely the holding of the court in Beyer v. Donaldson, 57 Ohio App.2d 24, 11 O.O.3d 16, 384 N.E.2d 712 (Hamilton Cty.1978). There, the court was faced with the issue of whether a chief of police has the exclusive authority to suspend an employee under § 737.12 in the face of a city charter which vests the authority to "remove" such employees in the city manager. The court held that in such a situation the charter provision controls. Id., 57 Ohio App.2d at 29, 11 O.O.3d 16, 384 N.E.2d 712.

Similarly, we are bound to conclude in the case at bar that § 4.03(1) and (2) of the Brunswick City Charter takes precedence over O.R.C. § 737.12. This of necessity means that, pursuant to state law, the city manager rather than the chief of the fire department or the safety director possesses final decisionmaking authority in the area of suspending fire department employees. In other words, Trimble must be considered the final policymaker under state law over the area in question, rather than Combs or Crane. Therefore, the actions of Combs in suspending Pesek and of Crane in upholding that suspension cannot be said to represent the official policy of Brunswick, which for this reason cannot be held liable there-

for under § 1983. At most, the actions of Combs and Crane can only be regarded as discretionary in nature which, according to the prevailing law, is not enough for municipal liability to attach. *See Pembaur*, 475 U.S. at 483 n. 12, 106 S.Ct. at 1300 n. 12; *Hull*, 926 F.2d at 515–16. The court concludes, in sum, that the City of Brunswick is not liable for the decision to suspend Pesek in retaliation for exercising his first amendment rights.

■ It is now left to determine the issue of municipal liability regarding the violation of Pesek's first amendment right by the City Council at the meeting of April 15, 1991. In its post-trial brief, Brunswick admits both that § 3.05(b) and its prohibition represent an official policy of the city and that the Charter's enforcement at the meeting was made by the entity which possessed final decisionmaking authority over the area in question, the City Council. *Id.* at 9. Brunswick's only defense to this aspect of Pesek's claim is that he did not possess the constitutional right to express himself at the City Council meeting in the first instance. *Id.* at 10–17. Inasmuch as the court has determined this issue in adverse fashion to defendants, we are constrained to conclude that municipal liability attaches as to this portion of Pesek's first amendment claim. The court, therefore, holds Brunswick liable for the violation of Pesek's first amendment right occurring on April 15, 1991.

With the question of municipal liability aside, the court now turns to issues regarding the individual liability of defendants Trimble, Crane, and Combs.

### E. Individual Liability [12]

At the close of Pesek's case, the individual defendants moved for a directed verdict on the basis of qualified immunity. Although they had pled immunity as an affirmative defense in answering the complaint, they failed to raise it again by way of motion at any point prior to trial. When the motion for directed verdict was prof-

fered, counsel for Pesek argued that the individual defendants' failure to assert the defense prior to trial by way of motion worked a waiver of the defense and entitled the court as factfinder to decide the question of individual liability on the merits. The court denied the motion for directed verdict, indicating that the waiver issue would be revisited, and the trial concluded.

In their post-trial briefs, the parties again address the issue of whether the individual defendants waived the defense of qualified immunity by not raising it by way of motion prior to trial. Both Pesek and the individual defendants rely in large part upon *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), for their respective positions. However, in *Kennedy v. City of Cleveland*, 797 F.2d 297 (6th Cir.1986) *cert. denied* 479 U.S. 1103, 107 S.Ct. 1334, 94 L.Ed.2d 185 (1987), a case cited by neither side to this dispute, the Sixth Circuit interpreted *Mitchell* in a manner which is wholly dispositive of the issue herein. Consequently, we turn to an analysis of that case.

At issue before the court in *Kennedy* was "whether the right to take an immediate interlocutory appeal [from the denial of qualified immunity] is conditioned upon the filing of a timely notice and further whether the right itself can be subject to waiver for noncompliance with reasonable temporal limitations placed by the district court upon the filing of motions seeking immunity." *Id.*, 797 F.2d at 298. Thus, while the issue of whether a § 1983 defendant waives the qualified immunity defense by not raising it in a motion prior to trial was not directly before the court, the appellate court's extensive discussion of *Mitchell* is nonetheless illuminating on this point. Initially, the court emphasized that *Mitchell* stands in the main for the proposition that qualified immunity is a defense to *litigation*, as opposed to merely *liability*, for money damages. The *Mitchell* opinion itself provides:

---

**12.** As previously mentioned, Pesek seeks recovery against Trimble, Combs, and Crane in both their official and individual capacities. *See* no.

6, *supra.* This portion of the court's analysis is only concerned with the latter facet of Pesek's claim.

At the heart of the issue before us is the question whether qualified immunity shares this essential attribute of absolute immunity—whether qualified immunity is in fact an entitlement not to stand trial under certain circumstances. The conception animating the qualified immunity doctrine as set forth in *Harlow v. Fitzgerald*, 457 U.S. 800 [102 S.Ct. 2727, 73 L.Ed.2d 396] (1982), is that "where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequences.'" *Id.*, at 819 [102 S.Ct. at 2739] quoting *Pierson v. Ray*, 386 U.S. 547, 554 [87 S.Ct. 1213, 1217, 18 L.Ed.2d 288] (1967). As the citation to *Pierson v. Ray* makes clear, the "consequences" with which we were concerned in *Harlow* are not limited to liability for money damages; they also include "the general costs of subjecting officials to the risks of trial—distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service." *Harlow*, 457 U.S., at 816 [102 S.Ct., at 2737]. Indeed, *Harlow* emphasizes that even such pretrial matters as discovery are to be avoided if possible, as "[i]nquiries of this kind can be peculiarly disruptive of effective government." *Id.*, at 817 [102 S.Ct., at 2737–38].

*Id.*, 472 U.S. at 525–26, 105 S.Ct. at 2815, quoted in *Kennedy*, 797 F.2d at 299. The Court in *Mitchell*, discussing *Harlow*, goes on to state that a defendant to a § 1983 suit can avoid the burdens of discovery and/or litigation by raising the defense of immunity in either of two methods: by way of a Rule 12(b)(6) motion to dismiss prior to discovery, or by way of a Rule 56 motion for summary judgment prior to trial. *Id.*, 472 U.S. at 526, 105 S.Ct. at 2815. The Court also pointed out that qualified immunity "is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id.* (emphasis in original).

Pesek seizes upon the *Mitchell* Court's latter statement to argue that a defendant waives the defense if he does not raise it prior to trial in either a motion to dismiss or a motion for summary judgment. *See* Plaintiff's Post–Trial Memorandum at 14. Pesek contends, in effect, that qualified immunity is *only* a defense to discovery and litigation, *not* to liability. In *Kennedy*, however, the Sixth Circuit differs with this reading of *Mitchell*. According to the court in *Kennedy*, the concept of immunity encompasses *three "independent aspects" of immunity:*

> *Mitchell v. Forsyth*, as we read it, counsels the trial courts to consider three different and relatively independent aspects of immunity. In addition to *the historic right to be immune from ultimate liability in damages, Mitchell* contemplates two stages at which the doctrine of immunity may be interposed in advance of trial to avoid two distinct burdens of litigation. A defendant may initially raise immunity as a bar to litigation in a motion to dismiss.... Next *Mitchell* holds that "even if the plaintiff's complaint adequately alleges the commission of acts that violated clearly established law, the defendant is entitled to summary judgment if discovery fails to uncover evidence sufficient to create a general issue as to whether the defendant in fact committed those acts." *Id.*

*Id.*, 797 F.2d at 299 (footnotes omitted, emphasis added).

■■■■ The defense of qualified immunity thus allows a government official to invoke the "historic right" to be free from liability for money damages, as well as from litigation itself. Consequently, where the trial court rejects the defense on the motions, the § 1983 defendant remains free to raise it again as a defense to liability:

> *Mitchell* makes it clear that the immunity doctrines' protections against liability and against the various burdens of litigating insubstantial claims are conceptually distinct. *Mitchell*, 105 S.Ct. at 2816. Consequently, decisions with respect to dismissal or summary judgment, if adverse, do not preclude the interposition

of the defense of immunity as a defense to liability on the merits.

*Id.*, 797 F.2d at 300. In addition, although certainly the defense may be waived under certain circumstances, the § 1983 defendant is entitled to affirmatively plead it in his answer to the complaint and then raise it as a defense to liability on the merits without first doing so by means of a motion prior to trial:

> Since immunity must be affirmatively pleaded, it follows that failure to do so can work a waiver of the defense. And since certain of the interests protected by the doctrines of immunity are conceptually distinct, and all of them are procedurally distinct, the failure to plead immunity may, at different stages of the litigation, work either a partial or complete waiver. *Hence, we conceive it possible that one might assert immunity as an affirmative defense to the complaint and thus as an affirmative defense to ultimate liability without putting in issue his or her right to be free of subjection to trial or, before that, to the burdens of discovery.*

*Id.* (emphasis added). If the defendant official chooses this course, he has waived the defense as it pertains to protection against litigation, but not as it relates to protection against ultimate liability.

■ Of course, the last sentence of the foregoing passage does *not* mean that the defendant may wait to have the issue of qualified immunity decided by the factfinder after the close of all the evidence at trial. The well-accepted rule is that the resolution of the qualified immunity defense is a pure question of law for the court to decide; hence, the question may not be put to the factfinder. *Heflin v. Stewart County*, 958 F.2d 709, 717 (6th Cir.1992); *Daugherty v. Campbell*, 935 F.2d 780, 783 (6th Cir.1991), *cert. denied* —— U.S. ——, 112 S.Ct. 939, 117 L.Ed.2d 110 (1991). In the case at bar, the individual defendants asserted the defense at the close of Pesek's case by means of a motion for directed verdict, thus offering it to the court to decide as a matter of law. They did not, in other words, present it to the court as factfinder. For this reason, we find that the defense of qualified immunity was properly raised in this case pursuant to the dictates of *Mitchell* and *Kennedy*, as so was not waived. With this matter decided, it is now incumbent upon the court to determine the efficacy of the qualified immunity defense as applied to the facts herein. In making this determination, we of course act as a court of law rather than as the factfinder in this case.

It is first necessary to briefly set forth the standards which apply in this type of analysis. These standards have been set forth in *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In that case the Eighth Circuit Court of Appeals reversed the trial court's grant of summary judgment relief in a *Bivens*[13] action. In vacating the Court of Appeals' decision, the Supreme Court reaffirmed the objective test for qualified immunity established in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In *Harlow*, the Court stated that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738.

The Court in *Creighton* not only affirmed but expanded upon *Harlow* by holding that in a qualified immunity analysis, the Court must determine whether a reasonable person could have believed that defendants' actions were lawful in light of clearly established law *and* in light of the information the defendants possessed at the time of the incident. *Creighton*, 483 U.S. at 641, 107 S.Ct. at 3039. The *Creighton* Court clearly places more emphasis on the objective reasonableness of an officer's actions as based upon the information he or she possesses, whereas the *Harlow* Court

---

**13.** *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

focused more upon whether or not the right asserted is clearly established. In *Martin v. City of Eastlake*, 686 F.Supp. 620, 626 (N.D.Ohio 1988), the court draws this distinction as follows:

> Under the *Creighton* standard, an officer may be able to successfully assert the qualified immunity defense even though he violated a clearly established constitutional right. The focus of the qualified immunity defense in *Creighton* is not on whether the constitutional right was established or not, but is on whether a *reasonable police officer would have believed* that the actions violated clearly established constitutional rights.

■ A right is "clearly established" when the contours of that right are sufficiently clear that a reasonable officer would understand that what he is doing violates that right. *Creighton*, 483 U.S. at 640, 107 S.Ct. at 3039. *See also Poe v. Hayden*, 853 F.2d 418, 423 (6th Cir.1988) ("The relevant inquiry focuses on whether a reasonable official in the defendant's position could have believed his conduct to be lawful, considering the state of the law as it existed when the defendant took his challenged actions.").

■ As one can ascertain from the discussion thus far, proper analysis of the qualified immunity doctrine directs the court to make a two-fold inquiry. First, the court must ask whether the constitutional right alleged to have been violated was clearly established at the time of the alleged incidents. In making the determination of whether the right was clearly established, the district court must look to decisions of the Supreme Court or those of the Sixth Circuit. *Hall v. Shipley*, 932 F.2d 1147, 1150 (6th Cir.1991); *Eugene D. v. Karman*, 889 F.2d 701, 706 (6th Cir. 1989), *cert. denied* 496 U.S. 931, 110 S.Ct. 2631, 110 L.Ed.2d 651 (1990). Further, the right in question must be a "particularized," as opposed to a "generalized," right. The Sixth Circuit has recently discussed this distinction in the following manner:

> We recognize that there is no definitive guide as to when a right is "clearly established." *Zweibon v. Mitchell*, 720 F.2d 162, 168–69 (D.C.Cir.1983). "The right in question, however, cannot be simply a generalized right, like the right to due process." *Danese v. Asman*, 875 F.2d 1239, 1242 (6th Cir.1989) (citing *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). *See also Garvie [v. Jackson]* 845 F.2d [647] at 650–52 [6th Cir. (1988)]. The Supreme Court, concerned that the artful pleader could convert the rule of qualified immunity into a rule of virtually unqualified liability by alleging a violation of extremely abstract rights, recently stressed that the right allegedly violated must have been clearly established in a more *particularized* sense. *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* Simply put, while official action is not necessarily protected by qualified immunity unless and until the very action in question has been held unlawful, *id.*, the unlawfulness must be apparent in light of pre-existing law. *Malley v. Briggs*, 475 U.S. 335, 344–45, 106 S.Ct. 1092, 1097–98, 89 L.Ed.2d 271 (1986).

*Marsh v. Arn*, 937 F.2d 1056, 1067 (6th Cir.1991) (emphasis in original). *See also Heflin*, 958 F.2d at 717; *Rich v. City of Mayfield Heights*, 955 F.2d 1092, 1095 (6th Cir.1992); *Guercio v. Brody*, 911 F.2d 1179, 1183–85 (6th Cir.1990), *cert. denied* —— U.S. ——, 111 S.Ct. 1681, 114 L.Ed.2d 76 (1991).

■ As one can surmise from this discussion, the second inquiry under the qualified immunity analysis is inseparably intertwined with the first. Under this inquiry, the court must first examine the facts put forth by the plaintiff in support of his position. The court must then ask and answer the following question with respect to each defendant official: would any reasonable official in that defendant's position have known that what that defendant did, as expressed in plaintiff's evidence, violated plaintiff's clearly established right? In formulating its answer to this question, the

court must keep in mind that the "clearly established right" in question is defined by the specific factual circumstances of the particular case at bar. Thus, the facts of the case not only guide the court's delineation of the federal right in question, but also its determination of the objective reasonableness of the defendant official's alleged actions.[14]

█ Although the assertion of qualified immunity by definition raises an affirmative defense, the Sixth Circuit has ruled that the ultimate burden lies with the plaintiff to present facts which if true would show that the defendant officials are not entitled to the defense. *Rich*, 955 F.2d at 1095; *Wegener v. City of Covington* 933 F.2d 390, 392 (6th Cir.1991). Thus, in order to overcome the defense of qualified immunity, it is incumbent upon plaintiff to present some evidence that the defendant officials violated a clearly established right by means of objectively unreasonable actions. *Hull, supra*, 926 F.2d at 512.

█ In applying the foregoing standards to Pesek's first amendment claim, the specific questions facing the court are numerous. We must examine the facts as they pertain to each defendant official and determine whether what that official specifically did was reasonable in light of the state of law existing at the time. Put another way, we ask the following question: as to each defendant official, would any reasonable official in his place have known that the law specifically forbade the particular conduct undertaken at the time in question? This question represents the "fact-specific" approach which must be undertaken in the qualified immunity analysis.

In light of the fact that Pesek's first amendment rights were violated on two separate occasions and that Pesek is attempting to hold all three individual defendants liable for each violation, the court must effectively make six inquiries in order to resolve the qualified immunity issue. We will deal first with the violation which occurred on April 15, 1991. As previously mentioned, the testimony reveals that all three defendants were present at the City Council meeting. However, of the three defendants, only Trimble took any part in the discussion with Pesek as to the latter's right to speak. There is no evidence that either Crane or Combs authorized, encouraged, acquiesced, or otherwise participated in the actions of Trimble. At most, Crane and Combs remained silent and did not interfere in order to take corrective action against Trimble. As such, the fact-specific question raised by the qualified immunity defense as it pertains to Crane and Combs is the following: would any reasonable official have known on the night of April 15, 1991 that allowing a fellow official to prohibit a citizen from speaking at a city council meeting without interfering to take corrective action would have violated the citizen's clearly established right? Conversely, was the right asserted, expressed in this fact-specific manner, clearly established at that time?

The court must answer these questions in the negative. We are unable to locate any Supreme Court or Sixth Circuit cases which have expanded the constitutional right set forth in *City of Madison* and its progeny in this manner. Nor has Pesek directed the court's attention to any such case authority. In this regard, it is recalled that the § 1983 plaintiff bears the burden of establishing that the defendant officials are not entitled to the immunity sought. Thus, for the reasons stated, we find that Crane and Combs are immune from liability for the violation of Pesek's first amendment right occurring in April 15, 1991.

█ With regard to Trimble, who did directly prohibit Pesek from speaking on the night in question, the issue is more

---

**14.** It thus appears that, pursuant to *Anderson* and its Sixth Circuit progeny, the two-pronged inquiry is in effect a single one, inasmuch as a delineation of the clearly established right in a "particularized" sense necessitates an examination of the facts involving the specific conduct of the defendant official and the reasonableness thereof. It remains for the Supreme Court or our circuit to determine whether this is, in fact, the proper focus of the qualified immunity doctrine.

complex. Nonetheless, we are constrained, in the final analysis, to similarly conclude that Trimble cannot be held liable for his conduct. In this regard, we refer to our previous discussion regarding the *Knight* and *City of Madison* cases. A reading of these cases reveals two distinct rights held by the respective parties to this suit: the right of Pesek to speak on matters of public concern at a city council meeting open to the public and the right of the City Council as a government entity not to listen to the views of its citizens regarding the making of public policy. The former right has already been extensively discussed by the court. We believe, at this point, that the latter right is deserving of further comment. The Court in *Knight* described this right in the strongest of terms and we believe this description is worthy of quotation:

> Policymaking organs in our system of government have never operated under a constitutional constraint requiring them to afford every interested member of the public an opportunity to present testimony before any policy is adopted. Legislatures throughout the Nation, including Congress, frequently enact bills on which no hearings have been held or on which testimony has been received from only a select group. Executive agencies likewise make policy decisions of widespread application without permitting unrestricted public testimony. Public officials at all levels of government daily make policy decisions based only on the advice they decide they need and choose to hear. To recognize a constitutional right to participate directly in government policymaking would work a revolution in existing government practices.
>
> Not least among the reasons for refusing to recognize such a right is the impossibility of its judicial definition and enforcement. Both federalism and separation-of-powers concerns would be implicated in the massive intrusion into state and federal policymaking that recognition of the claimed right would entail. Moreover, the pragmatic considerations identified by Justice Holmes in *Bi-Metallic Investment Co. v. State Board of Equalization, supra* [239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915)] are as weighty today as they were in 1915. Government makes so many policy decisions affecting so many people that it would likely grind to a halt were policymaking constrained by constitutional requirements on whose voices must be heard. "There must be a limit to individual argument in such matters if government is to go on." *Id.*, at 445, 60 L.Ed. 372, 36 S.Ct. 141 [at 142]. Absent statutory restrictions, the State must be free to consult or not to consult whomever it pleases.
>
> However wise or practicable various levels of public participation in various kinds of policy decisions may be, this Court has never held, and nothing in the Constitution suggests it should hold, that government must provide for such participation. In *Bi-Metallic* the Court rejected due process as a source of an obligation to listen. Nothing in the First Amendment or in this Court's case law interpreting it suggests that the rights to speak, associate, and petition require government policymakers to listen or respond to individuals' communications on public issues. Indeed, in *Smith v. Arkansas State Highway Employees*, 441 U.S. 463, 646–466, 60 L.Ed.2d 360, 99 S.Ct. 1826 [1828–1829] (1979), the Court rejected the suggestion. No other constitutional provision has been advanced as a source of such a requirement. Nor, finally, can the structure of government established and approved by the Constitution provide the source. It is inherent in a republican form of government that direct public participation in government policymaking is limited. *See* The Federalist No. 10 (J. Madison). Disagreement with public policy and disapproval of officials' responsiveness, as Justice Holmes suggested in *Bi-Metallic, supra*, is to be registered principally at the polls.

*Id.*, 465 U.S. at 283–85, 104 S.Ct. at 1065–66.

The nature of the competing rights at issue in this case, we believe, supports Trimble's assertion of the qualified immuni-

ty defense. A review of the case law on the subject and the facts elicited at trial posit the following question: would any reasonable official in Trimble's position have known that not allowing Pesek to speak, or refusing to listen to him speak, violated his constitutional rights? We believe that reasonable government officials in the position of Trimble might differ as to the answer to this question based upon a reading of *Knight* and *City of Madison*. While the court is of the belief that the answer to this question turns upon a determination concerning the nature of the forum, we cannot hold the public official performing discretionary functions to this awareness.

The court's conclusion regarding the qualified immunity of Trimble is further buttressed by two other factors surrounding these events, factors which must be considered under the fact-specific approach to the immunity defense. First, there exists no Sixth Circuit authority interpreting either *City of Madison* or *Knight;* hence, defining the "clearly established right" is all the more difficult in this case. Second, the individual defendants, including Trimble, sought and received a legal opinion from the Brunswick Law Director, who concluded that Trimble's action was lawful. Although this latter event occurred subsequent to the City Council meeting, we believe it supports the conclusion that reasonable officials might disagree over whether Trimble violated a clearly established right. These factors, together with the court's previous analysis, support the conclusion that Trimble is entitled to the immunity sought.

 The remaining issue regarding Pesek's first amendment claim as posited against the individual defendants is whether liability should be imposed against any or all of them for the decision to suspend Pesek and the upholding thereof.[15] The undisputed evidence in this case reveals that Combs and Crane each had a direct role in Pesek's suspension, Combs making the initial determination on May 7, 1991 and Crane affirming the decision on Sep-

tember 17, 1991. In determining whether the shield of immunity protects these defendants from liability for the violation of Pesek's first amendment right, we find one particular case to be wholly dispositive. In *Guercio v. Brody, supra,* 911 F.2d 1179, the plaintiff, a former secretary of a bankruptcy judge, brought a *Bivens* action for wrongful discharge based upon alleged retaliation for her exercise of free speech rights against two bankruptcy judges. Specifically, the plaintiff alleged that she had been discharged for her disclosure of corruption within the bankruptcy court. The district court originally granted both judges absolute immunity, but the Sixth Circuit reversed this decision. *Guercio v. Brody,* 814 F.2d 1115 (6th Cir.1987). On remand, the judges filed motions to dismiss the complaint based upon qualified immunity.

The district court denied the motions to dismiss and, in so doing, analyzed the asserted "clearly established" right in the generalized and abstract, rather than in the "particularized," manner. On appeal, the Sixth Circuit ruled that the district court had erred in not analyzing the qualified immunity defense by means of the fact-specific approach. According to *Guercio,* the fact-specific approach to the qualified immunity defense in cases involving alleged employment retaliation for the exercise of first amendment rights must focus upon two factors. The court should ask, first, whether reasonable officials in the defendant official's position "could have disagreed on whether and to what extent [the plaintiffs] speech was protected by the first amendment." *Id.,* 911 F.2d at 1185, quoting *Garvie v. Jackson,* 845 F.2d 647, 650 (6th Cir.1988). As part of this inquiry, the court should ask "whether and to what extent [the plaintiff's] speech was on a matter of public concern," *Guercio,* 911 F.2d at 1189. Second, the court must determine whether reasonable officials in the defendant official's position could disagree as to "where the *Pickering* scale, with all the parties' competing interests in the balance, would come to rest." *Id.*

---

**15.** We allude here to the court's view of the interlacing of issues as noted in fn. 10 *supra.*

In undertaking the foregoing inquiry, the court is compelled to conclude that Combs and Crane are protected by the doctrine of qualified immunity concerning this portion of Pesek's claim. First, that portion of our previous analysis which examined the confusion engendered by the competing rights at stake should make it clear that reasonable officials might differ as to whether Pesek's attempted speech on April 15, 1991 was protected by the first amendment. Based upon the state of the law at the time, it would have been reasonable for any official in the position of either Combs or Crane to have supposed that, inasmuch as no citizen possesses the right in general to force the government to listen to his views, neither Combs nor Crane violated Pesek's first amendment right by suspending him. Of course, this is not to say that the right was not in fact violated; the court has already found that it was. It is only to say that reasonable officials in the position of Combs and Crane might disagree on the issue.

In addition, due to the fact that Pesek never spoke, it would have been impossible for any official in the position of Combs and Crane to determine with exactness whether and to what extent the attempted speech was on a matter of public concern; necessarily, then, reasonable officials could disagree on this issue. Thus, although Pesek's testimony at trial revealed that he desired to speak on a matter of public concern, it would have been impossible for any official *at the time Combs and Crane acted* to ascertain with specificity the nature of the attempted speech, *i.e.*, its content, form, and context.[16] Our conclusion in this regard should also make it clear that reasonable officials in the place of Combs and Crane might disagree as to where the *Pickering* balance would come to rest. We would also add, as previously mentioned, that both Combs and Crane sought legal advice prior to the suspension from Bruns-

wick's law director who informed them not only that Pesek's conduct at the Council meeting was in violation of the Charter, but also that Trimble acted within constitutional limits in not allowing him to speak. This additional factor, we believe, removes all doubt which may remain as to whether Combs and Crane should lose the shield of immunity.

■ The court's finding as to Combs and Crane is dispositive of Trimble's qualified immunity defense to Pesek's first amendment retaliation claim. In contrast to Combs and Crane, Trimble had no direct role in suspending Pesek. At most, he participated in discussions with Combs and Crane regarding the efficacy of potential punishment, and so might be responsible for the suspension in an indirect sense as Combs' and Crane's supervisor. However, even if it were concluded that Trimble was also responsible for the decision, the same reasons which justify the conferral of immunity from liability upon Combs and Crane mandate that the same protection be granted to Trimble. Consequently, the court concludes that all three individuals are qualifiedly immune from liability for the decision to suspend Pesek as punishment for the latter's attempt to exercise his free speech rights.

■ Before the court closes this portion of our analysis, two final observations regarding the doctrine of qualified immunity are warranted. First, it must be emphasized that, even where a constitutional right is found to have been violated, the officials responsible therefor may still be entitled to qualified immunity. *Doe v. Sullivan County, Tennessee,* 956 F.2d 545, 554 (6th Cir.1992). Thus, in the case at bar, it is in no way inconsistent to find a violation of Pesek's first amendment rights while at the same time granting immunity to the defendant officials involved.

---

**16.** One might imagine the argument being made here that inasmuch as plaintiff had not spoken, his subject was not disclosed and it could not be adjudged whether he sought to speak on an agenda item. Were that so, then *arguendo*, his liberty to speak on a subject upon to public discussion was not infringed upon. It is believed that the factual setting posed by the record makes it clear that plaintiff intended to speak on a public issue as we have previously suggested.

Moreover, where the defendant officials have been granted qualified immunity, it is still possible to find the municipality liable under § 1983. "Stated another way, it is possible that city officials may be entitled to qualified immunity for certain actions while the municipality may nevertheless be held liable for the same actions." *Barber v. City of Salem*, 953 F.2d 232, 238 (6th Cir.1991). *See also Doe, id.* In other words, where a municipal policy has caused the deprivation of a constitutional right, municipal liability exists although the actions of the officials involved may be viewed as objectively reasonable in light of pre-existing law. In the case at bar, then, the granting of qualified immunity in this case is no bar to finding municipal liability on an aspect of Pesek's first amendment claim.

### F. The Constitutionality of the Brunswick City Charter Provision

In his complaint, Pesek alleges that § 3.05(b) of the Brunswick City Charter is unconstitutional on its face and as applied to him as a "prior restraint to speech." *Id.* at ¶¶ 14, 16. With regard to Pesek's challenge to the charter provision as applied to him in this case, the court agrees that it was utilized in a manner which deprived Pesek of his first amendment guarantees for the reasons previously stated in Section II, subpart C, *supra.* Thus, Pesek's challenge to § 3.05(b) of the Brunswick City Charter as applied is upheld.

Unfortunately, neither in his trial memorandum nor his post-trial memorandum does Pesek elucidate upon his challenge to the facial validity of § 3.05(b) of the Charter. Nor did counsel for Pesek state the basis for such a challenge in his opening or closing statements before the court. Pesek has, apparently, chosen to abandon this claim in order to focus upon other aspects of his case. To the extent that this claim remains subject to court review, however, we do not accept Pesek's contention that § 3.05(b) is facially unconstitutional. Again, we draw guidance from the opinion of the Fourth Circuit in *Local 2106 v. City of Rock Hill*, 660 F.2d 97, *supra*, which involved an identical challenge to an identical provision. The court in *Rock Hill* rejected this challenge for the following reasons, with which this court is in full agreement:

The firefighters contend that section 5–13–40(c) of the South Carolina Code is facially unconstitutional. The trial court correctly resolved that contention in favor of Rock Hill. Facially, the statute attempts to accomplish a desirable objective of the "Home Rule" movement—the elimination of political pressures from the operation of city governments. In plain terms, it simply prohibits city councils and their members from interfering with the direct supervision of city employees. South Carolina municipal councils, however, obviously retain their legislative powers and responsibilities to deal with employee and other matters that affect the operation of municipalities and it is in the exercise of this legislative function that councils create a public forum. It is Rock Hill's action, inappropriately relying on section 5–13–40(c), limiting access to this public forum that violates the first and fourteenth amendments to the United States Constitution—not the South Carolina statute.

*Id.*, 660 F.2d at 99.

Similarly, in the case at bar, Brunswick has followed the "home rule" movement in adopting a city-manager form of government and, in so doing, has implemented a charter provision which on its face only prohibits the City Council from interfering with the direct supervision of Brunswick employees by the city manager. The provision does not, on its face, implicate first amendment concerns in any way and for this reason must be held to withstand such a challenge. Pesek's challenge to the facial validity of § 3.05(b) of the Brunswick City Charter on first amendment grounds is therefore rejected.

### G. Damages

In addition to declaratory and injunctive relief, Pesek seeks in this case $200,000 in compensatory damages against all defen-

dants jointly and severally and $300,000 in punitive damages against the individual defendants only. Complaint, Prayer for Relief at ¶ D. Inasmuch as the court has held the individual defendants immune from liability in this case, the only issue before us regarding damages relates to Pesek's request for $200,000 in compensatory damages against Brunswick. Further, in light of the fact that Brunswick cannot be held liable for Pesek's suspension, the court is only to examine the extent of injury to Pesek resulting from the violation of his first amendment rights which occurred at the April 15, 1991 City Council meeting in assessing the proper amount of damages in this case.

The relevant rule of law regarding the appropriateness of damages in § 1983 cases was set forth by the Supreme Court in *Memphis Community School District v. Stachura*, 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986). In that case, which involved a first amendment violation, the Court held that "damages based on the abstract 'value' or 'importance' of constitutional rights are not a permissible element of compensatory damages" in § 1983 cases. *Id.*, 477 U.S. at 310, 106 S.Ct. at 2544. In order for the prevailing plaintiff to recover anything more than nominal damages in a § 1983 case, he must prove the existence of an actual, compensable injury resulting from the constitutional violation. *Id. See also Carey v. Piphus*, 435 U.S. 247, 264, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). The injury may either be physical or can manifest itself as impairment of reputation, humiliation, or mental and emotional distress. *Stachura*, 477 U.S. at 307, 106 S.Ct. at 2543; *Carey*, 435 U.S. at 264, 98 S.Ct. at 1052. Whether physical or non-physical, however, it must be actual. *Id.*

The Supreme Court also emphasized that "[w]hen a plaintiff seeks compensation for an injury that is likely to have occurred but difficult to establish, some form of presumed damages may be appropriate." *Stachura*, 477 U.S. at 310–11, 106 S.Ct. at 2545. That is, where the harm "may be impossible to measure," it may be appropriate for the court to award "presumed" or "general" damages as a substitute for compensatory damages. *Id.* The Sixth Circuit has held that such general damages are to be presumed in all cases where a first amendment violation has been established and actual damages are difficult or impossible to quantify; in such cases, the court is to award such damages because nonmonetary harm is presumed to have occurred. *Walje v. City of Winchester, Kentucky*, 773 F.2d 729, 732 (6th Cir. 1985). Post–*Stachura*, the Sixth Circuit has reaffirmed its position in this regard, *see Walje v. City of Winchester, Kentucky*, 827 F.2d 10, 13 (6th Cir.1987) (appeal after remand). In the second *Walje* opinion, the court upheld a $5,000 general damages award where a firefighter with a pregnant wife had been suspended in retaliation for exercising his free speech rights and "testified that he had never been under such pressure in his life and that he felt close to a nervous breakdown due to his suspension." *Id.*, 827 F.2d at 13. The court held that this testimony is "sufficient to support a $5,000 award of general damages." *Id.*

The court's first task in assessing damages in the case at bar is to ascertain any quantifiable measure of compensatory injury; if such is impossible, then we are to award some amount of general damages. With regard to injuries resulting from defendants' conduct as a whole, including the violation of his free speech rights occurring on April 15, 1991, Pesek testified that he has had problems with his wife (*i.e.*, "anger"), has had "sleepness nights," and that his relationship with fellow fire department employees has suffered.[17] The court finds that these injuries are difficult if not altogether impossible to quantify in terms of monetary value, in part because of the difficulty in delineating the extent to which the claimed harm resulted specifically from

---

17. Pesek also testified that he has been injured as a result of effectively losing his freedom of speech for one year, his inability to participate in discussions regarding public safety at City Council meetings, and the suspension on his record. This testimony is irrelevant, however, to the sole issue before the court regarding damages: whether and to what extent the deprivation of his free speech rights on the night of April 15, 1991 has resulted in injury to Pesek.

the events occurring at the April 15, 1991 City Council meeting. Thus, an award of general damages is necessary. In calculating such an award in this case, the court takes several factors into account. First, the injuries to which Pesek has been subjected are neither extensive nor grave. Further, Pesek has not offered any corroborative evidence to support his claims of injury, either by means of documentary evidence or supporting testimony. This is not to say that his testimony is wholly incredible; however, the lack of such corroboration mitigates against Pesek's claims as to the severity of the injury.

Finally, the evidence suggests that Pesek took an active and personal part in the display of his dispute with Brunswick throughout the relevant time period. He continually sent letters to the local newspaper which chronicled his plight and even sent it a copy of the complaint once it had been filed. The media, in turn, commented in detail concerning Pesek's dispute with the City. The fact that Pesek and his problems were the subjects of discussion and political comment were thus to a very great degree caused by the activities of plaintiff himself. So it is that, although the court is constrained to award general damages due to the directive of the Sixth Circuit discussed above, it is not believed that Pesek is entitled to any amount over and above a minimal level. Consequently, the court awards Pesek $100 for the deprivation of his first amendment right occurring on April 15, 1991, this "necessary in order to fully vindicate the challenged substantive right and to deter future conduct that threatens its practical significance." *Walje*, 773 F.2d at 732.

### III. CONCLUSION

For the foregoing reasons, the court finds as follows:

1) With respect to Pesek's challenge to his suspension based upon the fourteenth amendment *simpliciter*, the court finds no deprivation of any constitutional right and so finds for defendants.

2) With respect to Pesek's first amendment claims, the court finds that Pesek was deprived of his right of free speech when he was prohibited from speaking on April 15, 1991 and when he was subsequently suspended on May 7, 1991 for attempting to speak on April 15.

3) Defendant the City of Brunswick is not liable for the violation of Pesek's first amendment right occurring on May 7, 1991, but is liable for the violation of Pesek's first amendment right occurring on April 15, 1991.

4) Individual defendants Trimble, Crane, and Combs are immune from liability for both of the first amendment violations which occurred pursuant to the doctrine of qualified immunity.

5) Section 3.05(b) of the Brunswick City Charter was applied to Pesek in a manner which deprived him of his first amendment right of free speech, but is not facially unconstitutional.

6) Pesek is entitled to $100 in general damages for injury resulting to him from the deprivation of his first amendment right occurring on April 15, 1991. The City of Brunswick is thus instructed to reimburse Pesek in this amount.

With the court's opinion in this matter now at an end, this cause is hereby terminated in its entirety.

IT IS SO ORDERED.